Nos. 24-5407, 24-5459

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Lynwood Pickens,

Plaintiff – Appellant,

v.

Hamilton-Ryker IT Solutions, L.L.C.,

Defendant – Appellee.

On Appeal from the United States District Court
for the Middle District of Tennessee
(No. 3:20-CV-00141, Honorable William Lynn Campbell)

**ACTING SECRETARY OF LABOR'S BRIEF AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL
OF THE DISTRICT COURT'S DECISION**

SEEMA NANDA
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

RACHEL GOLDBERG
Counsel for Appellate Litigation

ERIN M. MOHAN
Senior Attorney
ANNE W. KING
Attorney
Fair Labor Standards Division
U.S. Department of Labor
200 Constitution Ave. N.W.
Room N-2716
Washington, DC 20210
(202) 693-7034
king.anne.w@dol.gov

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF INTEREST ..............................................................3

ISSUES PRESENTED.........................................................................3

STATEMENT OF THE CASE...............................................................4

    A.    Statutory and Regulatory Background  ................................4

    B.    Factual and Procedural Background  ...................................8

ARGUMENT ....................................................................................10

I.    The Text and Structure of the Department's Regulations, Along with *Helix,* Show Hamilton-Ryker Did Not Pay Pickens on a Salary Basis...................10

    A.    Pickens' Pay Did Not Satisfy 541.602(a)............................12

    B.    The District Court Also Erred in Concluding the Hourly Pay Pickens Received Constituted "Additional Compensation" Under 541.602(a)...........................................................................15

    C.    541.604(b) Provides the Only Path to Pay Hourly Employees Like Pickens on a Salary Basis...................................................18

    D.    The Department's Interpretation of the Salary-basis Regulations Is the Best Reading and Is Entitled to Deference ........................................21

II.    The Secretary of Labor Has Authority to Define and Delimit the EAP Exemption to Exclude Employees Who Receive Neither a True Salary Nor a Guarantee That Functions Like a Salary ......................................................21

CONCLUSION ..................................................................................29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alstate Constr. Co. v. Durkin*,
345 U.S. 13 (1953) ................................................................. 25

*Auer v. Robbins*,
519 U.S. 452 (1997) ..................................................... 21, 22, 27

*Barrentine v. Ark.-Best Freight Sys., Inc.*,
450 U.S. 728 (1981) ................................................................. 4

*Brock v. Claridge Hotel & Casino*,
846 F.2d 180 (3d Cir. 1988) .................................................. 14

*City of Chicago v. Fulton*,
592 U.S. 154 (2021) ............................................................... 18

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986) ............................................................... 26

*Gentry v. Hamilton-Ryker IT Sols., L.L.C.*,
2023 WL 4704115 (5th Cir. July 24, 2023) ......................... 17

*Gentry v. Hamilton-Ryker IT Sols., L.L.C.*,
102 F.4th 712 (5th Cir. 2024) ......................................... Passim

*Helix Energy Sols. Grp., Inc. v. Hewitt*,
598 U.S. 39 (2023) ......................................................... Passim

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ............................................................... 21

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) ............................................ 2, 22, 23, 24

*Pickens v. Hamilton-Ryker IT,*
   2024 WL 1337185 (M.D. Tenn. March 28, 2024) .......................................... 9, 10

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ........................................................................................ 24

*Walling v. Yeakley*,
   140 F.2d 830 (10th Cir. 1944) ........................................................................ 22

*Wilson v. Schlumberger Tech. Corp.*,
   80 F.4th 1170 (10th Cir. 2023) ........................................... 10, 16, 17, 18

## Statutes and Legislative Materials

Fair Labor Standards Amendments of 1949,
   Pub. L. No. 81-393, § 16(c), 63 Stat. 910 ......................................................25

Fair Labor Standards Amendments of 1961,
   Pub. L. No. 87-30, § 9, 75 Stat. 65................................................................26

Fair Labor Standards Amendments of 1966,
   Pub. L. No. 89-601, § 214, 80 Stat. 830................................................................26

Act of Oct. 13, 1976
   Pub. L. No. 94-489, § 3, 90 Stat. 2358................................................................26

Act of Nov. 15, 1990,
   Pub. L. No. 101-583, § 2, 104 Stat. 2871................................................................26

29 U.S.C. 204 ........................................................................................ 3

29 U.S.C. 207(a)(1)........................................................................ 4, 9

29 U.S.C. 211(a)........................................................................ 3

29 U.S.C. 213(a)(1)........................................................................Passim

29 U.S.C. 213(a)(15)........................................................................ 22

29 U.S.C. 216(c) ........................................................................ 3

iv

29 U.S.C. 217 .................................................................................................. 3

Proposed Amendments of the Fair Labor Standards Act of 1938:
  Hearings Before Subcomm. No. 4 of the H. Comm. on Educ. & Labor,
  80th Cong. 1019 (1947) .......................................................................... 25

Code of Federal Regulations

29 C.F.R. Part 541 ...................................................................... Passim

  29 C.F.R. 541.602(a) .............................................................. Passim

  29 C.F.R. 541.602(a)(1) ........................................................ 6, 11, 13

  29 C.F.R. 541.602(a)(2) ................................................................ 6

  29 C.F.R. 541.602(b)(1) ................................................................ 6

  29 C.F.R. 541.604(a) .............................................................. Passim

  29 C.F.R. 541.604(b) .............................................................. Passim

29 C.F.R. 541.118(b) (2004) ......................................................... 8

**Administrative and Regulatory Materials**

<u>Federal Register</u>

Defining and Delimiting the Exemptions for Executive, Administrative,
  Professional, Outside Sales and Computer Employees,
  68 Fed. Reg. 15,560 (Mar. 31, 2003) .................................................. 6

Defining and Delimiting the Exemptions for Executive, Administrative,
  Professional, Outside Sales and Computer Employees,
  69 Fed. Reg. 22,122-01 (April 23, 2004) ........................................ Passim

Defining and Delimiting the Exemptions for Executive, Administrative,
  Professional, Outside Sales, and Computer Employees,
  89 Fed. Reg. 32,842 (Apr. 26, 2024) .................................................. 5

Opinion Letters

Wage and Hour Opinion Letter FLSA2006-24,
2006 WL 2792438 (July 6, 2006) ...................................................................... 7

Miscellaneous

Stein Report (1944) ................................................................................... 5, 22, 23

Weiss Report (1949) ..................................................................... 5, 13, 14, 24-25, 28

**Dictionaries**

The Oxford English Dictionary (1933) ............................................................. 23, 24

Webster's Collegiate Dictionary (5th ed. 1942) ..................................................... 23

Funk and Wagnalls College Standard Dictionary (1943) ....................................... 23

Nos. 24-5407, 24-5459

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Lynwood Pickens,

Plaintiff – Appellant,

v.

Hamilton-Ryker IT Solutions, L.L.C.,

Defendant – Appellee.

On Appeal from the United States District Court
for the Middle District of Tennessee
(No. 3:20-CV-00141, Honorable William Lynn Campbell)

**ACTING SECRETARY OF LABOR'S BRIEF AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL
OF THE DISTRICT COURT'S DECISION**

The Department of Labor's ("Department") regulations provide two paths to pay employees on a salary basis, one of the requirements to demonstrate employees are employed in a "bona fide executive, administrative, or professional capacity" and exempt from the Fair Labor Standards Act's ("FLSA") minimum wage and overtime protections. 29 U.S.C. 213(a)(1); *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 55-56 (2023). First, the employer may pay a predetermined

1

amount that is no less than the employee's full salary for a week, month, or longer, without regard to the amount of time the employee actually works, *see* 29 C.F.R. 541.602(a). On top of this full salary, the employer may pay additional hourly compensation for hours worked *beyond* the normal workweek, but may not pay hourly compensation for hours worked *within* the normal workweek, *see* 29 C.F.R. 541.604(a). Alternatively, the employer may compute pay on an hourly (or daily or shift) basis for hours within the normal workweek and still satisfy the salary-basis requirement, but only if the employer provides a weekly guarantee resembling a full salary—one roughly equivalent to pay for the employee's normal workweek, *see* 29 C.F.R. 541.604(b). Either route ensures exempt employees have a stable and predictable salary, which the Department has long required to indicate the requisite status for the exemption. This longstanding regulatory framework, moreover, is well within the outer boundaries of the Department's express statutory authority to "defin[e] and delimit[]" who is an employee "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. 213(a)(1); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2268 (2024).

Because Hamilton-Ryker paid Pickens on an hourly basis for most of his normal workweek—thus failing to pay him a true salary—and also failed to pay him a guarantee that approximated a full salary for his normal workweek, the district court erred in deeming Pickens exempt under the FLSA's executive,

2

administrative, and professional ("EAP") exemption.  Indeed, the Fifth Circuit recently concluded, for these same reasons, that another Hamilton-Ryker employee, paid under an identical compensation scheme, was not exempt.  *Gentry v. Hamilton-Ryker IT Sols., L.L.C.*, 102 F.4th 712, 720-25 (5th Cir. 2024). Therefore, as in *Gentry*, Pickens was entitled to an overtime premium whenever he worked more than forty hours in a workweek.

## STATEMENT OF INTEREST

The Acting Secretary of Labor has a significant interest in this case because she is responsible for administering and enforcing the FLSA, 29 U.S.C. 204, 211(a), 216(c), 217, and has a substantial interest in ensuring that the Department's salary-basis regulations are construed properly.

## ISSUES PRESENTED

1.  Whether Pickens was paid on a salary basis where his compensation consisted of (1) hourly pay and (2) a weekly guarantee equivalent to his wages for the first eight hours worked.

2.  Whether the Department acted within the outer boundaries of its express statutory authority in establishing longstanding regulations defining and delimiting exempt executive, administrative, and professional employees, in part, by payment of an actual salary or, for an employee paid on an hourly basis, a weekly guarantee

that functions like a salary because it is roughly equivalent to the employee's usual earnings for a normal workweek.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

Congress enacted the FLSA to protect employees from "the evil of" "overwork" as well as "underpay," by requiring employers to pay an overtime premium for work over forty hours in a workweek. *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981); *see also* 29 U.S.C. 207(a)(1).  Workers are not "deprived of the benefits of the [FLSA] simply because they are well paid."

The FLSA includes an exemption from its overtime protections for "any employee employed in a bona fide executive, administrative, or professional capacity … as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor]."  29 U.S.C. 213(a)(1).  For over 80 years, the Department's regulations have defined this exemption using three distinct criteria: (1) an exempt employee must be paid on a salary basis (salary-basis test); (2) that salary must be at least a minimum specified amount (salary-level test); and (3) the employee must perform executive, administrative, or professional duties as

defined by the regulations (duties test). 29 C.F.R. Part 541.[1] Each criterion must

be satisfied for an employee to be exempt. This case concerns only the salary-

basis requirement.

The Department promulgated the salary-basis test to ensure "[the] exemption

applies only to salaried employees" and to exclude from exemption employees

"paid on an hourly basis." Stein Rpt. 23.[2] The salary-basis requirement "reflects

the widely-held understanding that employees with the requisite status to be bona

fide executives, administrators or professionals have discretion to manage their

time" and "are not paid by the hour or task, but for the general value of services

performed." Defining and Delimiting the Exemptions for Executive,

Administrative, Professional, Outside Sales and Computer Employees, 69 Fed.

Reg. 22,122-01, 22,177 (April 23, 2004).

Multiple provisions in 29 C.F.R. Part 541 "give content to the salary-basis

test." *Helix*, 598 U.S. at 46. To satisfy the "main salary-basis provision," *id.*, at

---

[1] The salary level was $455 per week ($23,660 per year) when this case arose, but for nearly all employers nationwide, it increased to $844 per week ($43,888 per year) effective July 1, 2024, and will increase to $1,128 per week ($58,656 per year) on January 1, 2025. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 89 Fed. Reg. 32,842-01, 32,845, 32,973 (Apr. 26, 2024).

[2] The Department's Wage and Hour Division ("Wage and Hour") issued reports accompanying its update to the Part 541 regulations in 1940 ("Stein Report"), 1949 ("Weiss Report"), excerpts of which are attached at Addendum 001-005 (A.001-005) and 006-009 (A.006-009).

541.602(a), an employee must "regularly receive[] each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. 541.602(a). An employee must "receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." 29 C.F.R. 541.602(a)(1). An employer generally cannot make "deductions from the employee's predetermined compensation." 29 C.F.R. 541.602(a)(2). "If the employee is ready, willing and able to work," the employee must be paid their salary even if "work is not available." *Id.* And an employer may not reduce an exempt employee's pay if the employee takes a few hours off for personal reasons, for example, 29 C.F.R. 541.602(b)(1), because such deductions negate "the exemption … even for highly paid employees," Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 68 Fed. Reg. 15,560-01, 15,572 (Mar. 31, 2003).

Section 541.604(a) explains which "additional compensation" on top of a salary does not "violat[e] the salary basis requirement." 29 C.F.R. 541.604(a) (listing, for example, "commission[s]," "a percentage of the sales or profits," or "additional compensation based on hours worked for work beyond the normal workweek"). Employers may reduce this "additional compensation" without

6

losing the exemption. *See, e.g.*, Opinion Letter FLSA2006-24, 2006 WL 2792438, at *2 (July 6, 2006).

Section 541.604(b) applies when compensation is '"computed on an hourly, a daily or a shift basis,' rather than a weekly or less frequent one," as required by 541.602(a), and thereby "lays out a second path—apart from § 602(a)—enabling a compensation scheme to meet the salary-basis requirement." *Helix*, 598 U.S. at 46, 55 (quoting 29 C.F.R. 541.604(b)). Specifically, 541.604(b) provides that a scheme paying employees an hourly (or day or shift) rate meets the salary-basis test only where "two conditions are met." *Helix*, 598 U.S. at 46-47. First, the employee receives "a guarantee of at least the minimum weekly required amount … regardless of the number of hours, days, or shifts worked," *and* second, "a reasonable relationship exists between the guaranteed amount and the amount actually earned." 29 C.F.R. 541.604(b).

Section 541.604(b)'s "reasonable relationship" condition is satisfied "if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek." *Id.* The reasonable relationship requirement ensures the "guaranteed amount" is sufficiently analogous to a full weekly salary so it is "a meaningful guarantee rather than a mere illusion." 69 Fed. Reg. at 22,184. The requirement

7

prevents employers from "circumvent[ing] the prohibition against docking for absences due to a lack of work" or other reasons.  *Id.*

Before 2004, the Department's regulations did not provide an express path to satisfy the salary-basis test for employees paid on an hourly basis for their normal workweek or who received additional hourly payments for hours worked beyond their normal workweek.[3]  In 2004, the Department addressed hourly pay in two ways.  First, the Department added language in 541.604(a) allowing employers to pay "additional compensation based on hours worked for work beyond the normal workweek" on "any basis," including an hourly basis.  29 C.F.R. 541.604(a).  Second, the Department promulgated 541.604(b), providing, for the first time, a regulatory "tolerance" allowing employers to compute employees' "actual pay" on an hourly basis and still satisfy the salary-basis test.  69 Fed. Reg. at 22,184.

## B.    Factual and Procedural Background

Pickens worked as a piping inspector for one of Hamilton-Ryker's gas industry clients.  Pickens Offer Letter, RE 53-5, Page ID # 323.  In any week in which Pickens performed any work, he received a guaranteed weekly payment of

---

[3] Before 2004, the Department had provided a regulatory path to satisfy the salary-basis test for employees paid on a day or shift basis who received a weekly guarantee, provided that the employee's compensation was not "divided into two parts"—a guaranteed minimum and an "additional" amount subject to reduction—that could have permitted "circumventing" the requirement that the employer pay the full salary in any week in which any work was performed.  29 C.F.R. 541.118(b) (2004).

$800, which Hamilton-Ryker characterized as a "salary." *Id.* He also received additional pay at a rate of $100 per hour for hours worked in excess of eight hours in a workweek, including any hours worked over forty hours, but he did not receive an overtime premium. *Id.* Therefore, Pickens' weekly guarantee of $800 was equivalent to his earnings for eight hours of work. Pickens typically worked more than forty hours per week, averaging over 51 hours of work each week. Pickens Br. 5.

Pickens brought suit under the FLSA, alleging Hamilton-Ryker violated the FLSA's overtime pay provision, 29 U.S.C. 207(a)(1), because it paid him the same hourly rate for all hours worked after the first eight, with no overtime premium for hours worked in excess of forty hours in a workweek. Complaint, RE 1, Page ID ## 1-9. The district court granted summary judgment to Hamilton-Ryker on Pickens' FLSA claims, holding Pickens was exempt from overtime compensation under the EAP exemption. *Pickens v. Hamilton-Ryker IT Sols.,* 2024 WL 1337185, at *5 (M.D. Tenn. March 28, 2024). The district court agreed with Hamilton-Ryker that the company's compensation scheme satisfied the main salary-basis test under 541.602(a) and further stated that Hamilton-Ryker's hourly payments did not undermine that conclusion because they were permissible "additional compensation" under 541.604(a). *Id.* at *3-4. The district court also rejected Pickens' argument that the compensation scheme should be analyzed under

541.604(b)'s alternative path. *Id.* at *3-5. Relying on *Wilson v. Schlumberger Technology Corp.*, 80 F.4th 1170, 1176 (10th Cir. 2023), the district court concluded that 541.602(a) and 541.604(a), not 541.604(b), applied here because, "[l]ike the [*Wilson*] plaintiff," Pickens received "a weekly salary"—the $800 guarantee—"that did not vary based on hours worked, plus additional compensation at an hourly rate." *Pickens,* 2024 WL 1337185, at *4-5

The district court did not address Hamilton-Ryker's argument that the Department lacks authority to establish a salary-basis test that is dispositive of the exemption for some employees and, when an employer pays employees on an hourly basis, that requires a weekly guarantee with a reasonable relationship to the employee's actual pay.

## ARGUMENT

## I.    The Text and Structure of the Department's Regulations, Along with *Helix*, Show Hamilton-Ryker Did Not Pay Pickens on a Salary Basis

*Helix* confirms that there are only "two ways" a compensation scheme may satisfy the salary-basis requirement, 598 U.S. at 60. First, the employer can pay "a straight weekly salary for time" the employee works in a full workweek, thereby satisfying 541.602(a). *Id.* In the alternative, if the employer pays the employee on an hourly (or day or shift) basis, it can pay a weekly guarantee meeting 541.604(b)'s conditions, including the reasonable relationship test. *Id.* Section 541.604(b) is the only available path to satisfy the salary-basis test where an

employer pays an employee on an hourly basis for hours within their normal workweek. Both paths ensure exempt employees receive stable and predictable pay for their normal workweek—a hallmark of exempt status.

Pickens' pay satisfies neither path. As the Fifth Circuit recently concluded when analyzing an identical compensation scheme used by the same employer as in this case, Pickens' pay—an eight-hour guarantee and hourly pay for the additional hours he worked in his workweek—does not satisfy the salary-basis test under 541.602(a). *Gentry*, 102 F.4th at 722. In 541.602(a), "basis" means the "unit" upon which pay is calculated, *Helix*, 598 U.S. at 52; *Gentry*, 102 F.4th at 720. Thus, Pickens is not paid on a "weekly[] or less frequent basis" under 541.602(a). *See Gentry*, 102 F.4th at 721-22. Nor does Pickens' eight-hour guarantee constitute his "full salary" for the week under the ordinary meaning of that phrase, given that he was paid with "regard to the number of … hours worked" for all hours beyond eight in his workweek. 29 C.F.R. 541.602(a)(1).

Section 541.604(a) does not alter this analysis, but reinforces 541.602(a) by permitting hourly compensation in addition to the employee's full salary, but *only* for hours "beyond the normal workweek." 29 C.F.R. 541.604(a); *Gentry*, 102 F.4th at 719. Pickens' pay for hours in excess of eight was not for work "*beyond* [his] normal workweek," but, on the contrary, constituted most of his pay for his normal workweek. *Id.*

And although Hamilton-Ryker's compensation scheme is precisely the type addressed by 541.604(b)—hourly pay during the normal workweek accompanied by a weekly guarantee—it nonetheless fails to satisfy 541.604(b)'s requirements. The guarantee—equal to only eight hours of work when Pickens regularly worked more than forty hours a week—is not "roughly equivalent to" Pickens' "usual earnings at the assigned hourly … rate" for Pickens' "normal scheduled workweek." 29 C.F.R. 541.604(b). While Hamilton-Ryker may prefer to avoid paying Pickens "a true salary" under 541.602(a) or a salary-like guarantee under 541.604(b), and simultaneously avoid paying overtime, the "whole point of the salary basis requirement," as *Helix* explains, is to take that "option off the table." 598 U.S. at 60.

## A.    Pickens' Pay Did Not Satisfy 541.602(a)

Contrary to the district court's conclusion otherwise, Pickens' pay did not satisfy 541.602(a). Instead, that provision "applies solely to employees paid by the week (or longer)," *Helix*, 598 U.S. at 50, because 541.602(a) is limited to pay schemes calculated on a "weekly, or less frequent" (such as a monthly) basis. 29 C.F.R. 541.602(a); *see also Gentry*, 102 F.4th at 720. "Basis" in 541.602(a) refers to the "unit" upon which pay is calculated. *Helix*, 598 U.S. at 52; *Gentry*, 102 F.4th at 720. Because Pickens' compensation was not based on a unit of a week or

12

more—he was not paid the same fixed amount *for* the week—his compensation does not satisfy 541.602(a). *See also Gentry*, 102 F.4th at 720-21.

Moreover, the text of 541.602(a) makes clear that the main salary-basis provision encompasses "what ordinary people think of as a salary," *Helix*, 598 U.S. at 54 n.5, because it provides that the "predetermined amount" in 541.602(a) must be the employee's "*full salary*" for the week "without regard to the number of days or hours worked." 29 C.F.R. 541.602(a)-(a)(1) (emphasis added); *see also* Weiss Rpt. 26 (explaining that the "predetermined amount" passage was adopted to implement the "full salary" requirement). As *Helix* explains, 541.602(a) "embodies the standard meaning of the word 'salary.'" 598 U.S. at 51. And in "common parlance" a salary is "linked" "to the stability and security of a regular weekly, monthly, or annual pay structure"—to "paycheck security." *Id.* at 52 (cleaned up). "A worker paid by the ... hour—docked for time he takes off and uncompensated for time he is not needed—is usually understood as a[n] ... hourly wage earner, not a salaried employee." *Id.*

Pickens' weekly guarantee was not his "full salary" for each week, under the standard meaning of that term. Instead, for hours worked after the first eight hours each week, he was paid with "regard to the number of … hours worked." *See* 29 C.F.R. 541.602(a)(1). To characterize an employee's eight-hour weekly guarantee as a salary when the majority of the employee's pay for the workweek is subject to

13

reduction "is fundamentally incoherent." *Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 184-85 (3d Cir. 1988) ("That a minimum payment unrelated to an employee's income is that employee's 'salary' stretches the common understanding of the term out of proportion").

## B.   The District Court Also Erred in Concluding the Hourly Pay Pickens Received Constituted "Additional Compensation" Under 541.604(a)

Contrary to the district court's reasoning, 541.604(a) does not permit Pickens' compensation scheme to satisfy the salary-basis test, but instead reinforces that the "predetermined amount" required by 541.602(a) must be the employee's "full salary" for the week. Section 541.602(a) provides that the "predetermined amount" may constitute "all or *part* of the employee's compensation," and 541.604(a) illustrates the types of "additional compensation" an employer can pay, on top of the 541.602(a) "part" that is a salary, without losing the exemption. *See also* Weiss Rpt. 26 (explaining that the Department originally drafted the phrase "predetermined amount constituting all or part of [the employee's] compensation" for the purpose of "mak[ing] it clear that additional compensation *besides the salary* is not inconsistent with the salary basis of payment") (emphasis added).

Section 541.604(a) makes plain, however, that any "additional compensation based on hours worked," must be for time worked "*beyond* the normal workweek." 29 C.F.R. 541.604(a) (emphasis added); *see also Gentry*, 102 F.4th at 722

14

(explaining that a "straight-forward reading of the text makes clear that [541.]604(a) does not envision hourly pay for work *within* the normal workweek"); 69 Fed. Reg. at 22,183 (explaining that 541.604(a) permits "additional compensation for extra hours worked *beyond the regular workweek*") (emphasis added).  In other words, when an employer pays an employee on an hourly basis for hours *within* their normal workweek, that employee does not receive their "full salary" on a weekly or less frequent basis as required by 541.602(a).

The hourly pay Pickens received for hours exceeding eight each week was not for work "*beyond* [his] normal workweek," but, on the contrary, it amounted to most of the pay for his normal workweek.  Pickens regularly worked approximately 51 hours per week, Pickens Br. 5, thus logging approximately 43 hours paid on an hourly basis.  Therefore, the eight hours for which he received guaranteed pay fell far short of his "normal" workweek.  Accordingly, Pickens' hourly pay for the bulk of his normal workweek does not qualify as "additional compensation" within 541.604(a).

This interpretation of 541.604(a), in conjunction with 541.602(a), is consistent with the purpose of the salary-basis test, which is to indicate the salary stability required for employees exempt from the FLSA's overtime pay protections.  As the Fifth Circuit explained in *Gentry*, 541.602(a), together with 541.604(a), "allow employers to pay a true weekly … salary paid on a weekly or less frequent

15

basis, plus additional compensation" because 541.602(a) "provides a stable and predictable source of income while [541.]604(a) allows performance incentives for work beyond the regular workweek." *Gentry*, 102 F.4th at 719.  By contrast, 541.604(b), not 541.604(a), "concerns hourly compensation *within* 'the employee's normal scheduled workweek.'" *Gentry*, 102 F.4th at 723 (quoting 29 C.F.R. 541.604(b)).

In concluding Hamilton-Ryker could pay Pickens on an hourly basis for hours within his normal workweek and still satisfy the salary-basis requirement, the district court erroneously relied on the Tenth Circuit's decision in *Wilson*.  Not only is *Wilson*'s pay scheme factually distinguishable from that at issue in this case and *Gentry*, *see Gentry*, 102 F.4th at 725; *Wilson*, 80 F.4th at 1177, 1179 n.4, *Wilson* appears to have incorrectly assumed—without analysis—that a guaranteed weekly payment labeled as a "salary" can satisfy 541.602(a) so long as the amount of that purported salary exceeds the salary level.  80 F.4th at 1175.  Therefore, as Gentry explained, *Wilson* fails to reach the "antecedent question in Helix: whether the [purported] salary ... provided a true weekly rate."  *Gentry*, 102 F.4th at 725 (cleaned up).  Notably, while *Wilson* is in tension with the result in *Gentry*, the

Tenth Circuit did not actually disapprove the reasoning of the controlling decision in *Gentry*, which the Fifth Circuit rendered after *Wilson*.[4]

In concluding that the salary-basis requirement is satisfied even if compensation is paid on an hourly basis for time worked during the employee's normal workweek, moreover, *Wilson* read out of context 541.604(a)'s statement that "additional compensation may be paid on any basis."  80 F.4th at 1176.  More completely, 541.604(a) states that an employer does not violate the salary-basis test "if an exempt employee who is guaranteed at least [the salary level] each week paid on a salary basis also receives additional compensation based on hours worked *for work beyond the normal workweek*."   29 C.F.R. 541.604(a) (emphasis added).  In the very next sentence, 541.604(a) provides that "*[s]uch* additional compensation"—i.e. the additional compensation for hours worked beyond the normal workweek—"may be paid on any basis" including "hourly."  *Id.* (emphasis added).  Thus, as explained above, and as the Fifth Circuit held in *Gentry*, 541.604(a) permits additional hourly compensation only for time worked beyond the normal workweek.  *Gentry*, 102 F.4th at 722; *see also* 69 Fed. Reg. at 22,183

---

[4] *Wilson* references the first panel decision, *Gentry v. Hamilton-Ryker IT Sols.*, L.L.C., 2023 WL 4704115 (5th Cir. July 24, 2023), a per curiam decision with little analysis, and which the panel ultimately withdrew and replaced with its more recent decision offering a robust analysis.

(describing the rule as providing that an "exempt employee may also receive additional compensation for extra hours worked beyond the regular workweek").

In addition, although *Wilson* accurately observed that 541.604(b) "does not refer to additional compensation at all," 80 F.4th at 1176, this fails to support that court's conclusion.  541.604(b) does not refer to "additional compensation" because the regulatory scheme does not categorize payment on a day, shift, or hourly rate for hours during the normal workweek as "additional compensation." In such circumstances, the "employee's pay is computed on an hourly, daily or shift basis."  29 C.F.R. 541.604(b); 69 Fed. Reg. at 22,184 (promulgating 541.604(b) as a regulatory "tolerance" allowing employers to compute an employee's "actual pay" on an hourly basis and still satisfy the salary-basis test).

## C.    541.604(b) Provides the Only Path to Pay Hourly Employees Like Pickens on a Salary Basis

The district court's reading of 541.602(a) and 541.604(a), and its conclusion that Hamilton-Ryker complied with those regulations, are not only contrary to those regulations' plain text, but also have the effect of reading 541.604(b) out of the regulations.  If an employer could satisfy 541.602(a) merely by paying an hourly worker a guarantee greater than the salary level, as the district court appears to assume, this would effectively nullify 541.604(b) because no employer would ever resort to 541.604(b) to meet the salary-basis requirement.  *Cf. City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("surplasage "canon" "is strongest" where

18

construction makes "same statutory scheme" "superfluous"). Section 541.604(b) provides that, where an employee receives an hourly rate, the compensation scheme may satisfy the salary-basis test if it satisfies "two conditions," *Helix*, 598 U.S. at 47, but the district court appears to assume that if a compensation scheme satisfies the first condition—a guarantee equal to at least the salary level—this automatically satisfies 541.602(a), and there is never a need to satisfy the second condition—a guarantee that functions like a salary by bearing a reasonable relationship to the amount the employee actually earns in a week.

Therefore, the district court's interpretation "subvert[s] 604(b)'s strict conditions" on how an hourly employee's pay "counts as a 'salary'" and deprives these employees of the important protection the reasonable relationship requirement provides in exchange for permitting an employer to treat them as exempt from overtime pay, namely "a steady stream of pay, which the employer cannot much vary and the employee may thus rely on week after week." *Helix*, 598 U.S. at 47, 56.

This is important for "workers at the heartland of the FLSA's protection," such as workers paid considerably less than Pickens. *Helix*, 598 U.S. at 61. Consider, for instance, a registered nurse who meets the duties test and is paid $53 an hour—just over half Pickens' hourly rate. An employer could structure the nurse's compensation to avoid paying an overtime premium merely by

guaranteeing payment for 16 hours ($848, which exceeds the current weekly salary level) in any week when the nurse works—even if the nurse is normally scheduled for far more hours in a week. As a result, if the nurse already worked overtime hours, the nurse would see reduced compensation due to lost overtime premiums. And if the nurse did not already work overtime, this would lower the cost of increasing the nurse's hours—because the employer would no longer need to pay an overtime premium—thereby undermining the FLSA's purpose of protecting employees from overwork. *See Helix*, 598 U.S. at 61 (explaining that many employers would pay a guarantee at the salary level "in a heartbeat if doing so eliminated the need to pay overtime").

The district court's approach could also harm employees who currently receive a true salary above the salary level and are exempt from overtime protection, including, possibly, certified public accountants, human resource managers, and construction superintendents.[5] Employers would be incentivized to guarantee such employees a reduced weekly amount equal to the currently applicable salary level. Employers could then (1) pay these employees the remainder of their normal weekly compensation by the hour, even when it constitutes the bulk of their earnings and (2) dock this previously predictable pay

---

[5] *See* Wage and Hour Field Operations Handbook 22j02; 22j08; 22j29, available at https://www.dol.gov/agencies/whd/field-operations-handbook.

when an employee arrives late one morning, attends a doctor's appointment, or even for absences attributable to the employer's business—actions incompatible with the notion that the employee is employed in a bona fide EAP capacity. And, under the district court's decision, because the employees would still be exempt, they would not be entitled to overtime premiums when they work more than forty hours in a week.

### D. The Department's Interpretation of the Salary-basis Regulations Is the Best Reading and Is Entitled to Deference

The interpretation of 541.602(a), 541.604(a) and 541.604(b) outlined above reflects the best interpretation of the salary-basis regulations in light of their text and structure and the Supreme Court's decision in *Helix*. Even if the regulations were ambiguous, the Department's interpretation of them is entitled to deference because it is a reasonable reading and reflects the agency's fair and considered expert judgment. *See Kisor v. Wilkie*, 588 U.S. 558, 563-64, 572-80 (2019); *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997).

### II. The Secretary of Labor Has Authority to Define and Delimit the EAP Exemption to Exclude Employees Who Receive Neither a True Salary Nor a Guarantee That Functions Like a Salary.

1. Congress *expressly* delegated the Secretary of Labor ("Secretary") the authority to "define[] and delimit[]" what it means to be "employed in a bona fide executive, administrative, or professional capacity," and therefore exempt from the FLSA's minimum wage and overtime protections. 29 U.S.C. 213(a)(1) (exempting

"any employee employed in a bona fide executive, administrative, or professional capacity … *as such terms are defined and delimited from time to time by regulations of the Secretary*") (emphasis added).  Indeed, *Loper Bright Enterprises v. Raimondo* specifically cited as an express delegation of congressional authority a parallel FLSA provision authorizing the Secretary to "define[] and delimit[]" through regulation the terms of another exemption.  144 S. Ct. at 2263 n.5 (citing 29 U.S.C. 213(a)(15)).  This "broad" discretion, *Auer*, 519 U.S. at 456, includes the authority not only to "'define,'" but also to "'delimit,'" the scope of the EAP exemption.  *See Walling v. Yeakley*, 140 F.2d 830, 831 (10th Cir. 1944) (explaining that "[d]elimit" means "to fix or mark the limits of"); *see also* Stein Rpt. 24 (explaining shortly after the Act's passage, that the EAP exemption "must contain such delimiting requirements … as will prevent abuse").

When—as here—Congress "expressly delegate[s]" to an agency "the authority to give meaning to a particular statutory term," the "role of the reviewing court" is to recognize the delegation, "fix[] the boundaries of [the] delegated authority," and to confirm "the agency has engaged in reasoned decisionmaking within those boundaries."  *Loper Bright*, 144 S. Ct. at 2263.  This Court accordingly "must respect" section 213(a)(1)'s broad "delegation, while ensuring that the agency acts within it."  *Loper Bright*, 144 S. Ct. at 2273.

2.  For more than 80 years, the Department has exercised this authority by defining and delimiting the phrase "bona fide executive, administrative, or professional capacity," to reflect an employee's *status*, as well as the tasks they perform.  *See, e.g.*, Stein Rpt. 5, 19.  Far from exceeding the "outer ... boundaries" of the statute, *Loper Bright*, 144 S. Ct. at 2268, this exercise of authority is fully consistent with the text of section 213(a)(1).

The term "capacity" encompasses "relation," "character," and "[p]osition." Capacity, 2 The Oxford English Dictionary 89 (1933) (A.016-018).  Each of these terms, when Congress enacted the FLSA, incorporated the concept of one's status. Position, Webster's Collegiate Dictionary 774 (5th ed. 1942) (A.021-022) (meaning "[r]elative place, situation, or standing; specif[ically] ... official rank or *status*") (emphasis added); Character, Webster's Collegiate Dictionary 170 (5th ed. 1942) (A.019-020) (meaning "[q]uality, position, rank or capacity; *status*") (emphasis added); Relation, Funk and Wagnalls College Standard Dictionary 959 (1943) (A.023-025) (meaning "the position of one person with respect to another").

Likewise, the ordinary meanings of the terms "executive, administrative and professional" also indicate an individual's "status," as well as the type of work they do.  As the Department explained near-contemporaneously in 1940, the "term 'executive' implies a certain prestige, status, and importance."  Stein Rpt. 19. Furthermore, a combination of "responsibility, authority, and prestige" divided

those employed in a "bona fide administrative capacity" from those who are "mere cog[s] in a large industrial wheel." *Id.* at 25.

Finally, the term "bona fide," which modifies "executive, administrative, or professional capacity," denotes "good faith," "sincerity," or "genuine[ness]." Bona fide, 1 The Oxford English Dictionary 980 (1933) (A.013-015). Therefore, reading the phrase "bona fide executive, administrative, or professional capacity" as a whole, section 213(a)(1) contemplates that both an employee's status and whether that status is "genuine" are relevant to defining and delimiting the EAP exemption.

3.  Since 1940, the Department's regulations have reflected the commonsense notion that this status is demonstrated, and can be verified, in part through the fact an employee is salaried.[6]  As the Department explained in 1949, its fact-finding showed that "[c]ompensation on a salary basis appears to have been almost universally recognized as the only method of payment consistent with the status implied by the term 'bona fide' executive." Weiss Rpt. 24.  The salary-basis

---

[6] Further underscoring the Department's statutory authority to use a salary-basis test as one component of the criteria for the exemption, *Loper Bright* recently reaffirmed that even when—unlike here—a statute does *not* expressly delegate authority to the agency, the "interpretations of those responsible for implementing" a particular statute "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  144 S. Ct. at 2262 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Such respect for the agency's interpretation is "especially warranted when"—like here—it "was issued roughly contemporaneously with enactment of the statute and remained consistent over time."  *Id.* at 2258; *see also id.* at 2262.

requirement "reflects the widely-held understanding that employees with the requisite status to be bona fide executives, administrators or professionals have discretion to manage their time" and "are not paid by the hour or task, but for the general value of services performed."  69 Fed. Reg. 22,122-01, 22,177.

4.  Congress, furthermore, has repeatedly ratified the salary-basis requirement as a component of the EAP exemption, beginning with the 1949 amendments to the FLSA.  By 1949, the Department's salary-basis regulation had been in place for nearly a decade.  In hearings preceding the 1949 amendments, however, the Chamber of Commerce of the United States urged Congress to define for itself the terms "executive, administrative, and professional employees," including by permitting greater "latitude" with respect to payment on a salary basis.  Proposed Amendments of the Fair Labor Standards Act of 1938: Hearings Before Subcomm. No. 4 of the H. Comm. on Educ. & Labor, 80th Cong. 1019 (1947) (A.010-012).  But Congress not only declined to retract or reduce the Secretary's authority to define the terms of the exemption, it explicitly specified that "[a]ny order, regulation, or interpretation of the" Department then in effect under the FLSA "shall remain in effect" unless inconsistent with the 1949 amendments.  Fair Labor Standards Amendments of 1949, Pub. L. No. 81-393, § 16(c), 63 Stat. 910, 920; *see also Alstate Constr. Co. v. Durkin*, 345 U.S. 13, 17

(1953) (refusing to disturb "an administrative interpretation of the [FLSA] which Congress refused to repudiate" in the 1949 amendments).

Since 1949, Congress has amended the FLSA on many other occasions, including amending section 213(a)(1), but has never disturbed the salary-basis test the Department has long applied to most EAP exempt employees.[7] Thus, in addition to its express ratification in 1949, Congress' "failure to revise or repeal" the Department's longstanding interpretation "is persuasive evidence that the interpretation is the one intended by Congress." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).

Indeed, further underscoring Congress's ratification of the salary-basis test, Congress expressly incorporated the Department's EAP regulations (and thus its salary-basis test) into the Service Contract Act of 1965, a separate statute relating to employee pay and benefits. *See* Act of Oct. 13, 1976, Pub. L. No. 94-489, § 3, 90 Stat. 2358, 2358.

5. Below, Hamilton-Ryker argued the Department lacks authority to have a salary-basis test that "result[s] in the exclusion from exempt status of employees ...

---

[7] *See, e.g.*, Fair Labor Standards Amendments of 1961, Pub. L. No. 87-30, § 9, 75 Stat. 65, 71-74 (amending the EAP exemption in light of Congress's expansion of FLSA coverage to retail employees); Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, § 214, 80 Stat. 830, 837 (amending EAP exemption to exempt certain education personnel); Act of Nov. 15, 1990, Pub. L. No. 101-583, § 2, 104 Stat. 2871, 2871 (amending EAP exemption to instruct the Secretary to promulgate regulations exempting computer professionals).

who undisputedly perform exempt duties." Memorandum Supporting Motion for Summary Judgment, RE 96, Page ID # 1577. But section 213(a)(1) does not use the terms "duties," or "perform." It refers to employees employed in a "bona fide executive, administrative, or professional capacity," which, as explained above, is not limited to (though it certainly includes) an employee's duties.

Moreover, the Supreme Court's unanimous decision in *Auer v. Robbins* forecloses the argument that the text of section 213(a)(1) unambiguously requires that duties be dispositive in every case. Although *Auer* involved a challenge to the application of the salary-basis test, rather than a general challenge to the validity of that test, Hamilton-Ryker's premise would preclude use of a salary-basis test to exclude employees with exempt duties from the exemption, just as the position advanced by the *Auer* employer would have. 519 U.S. at 457-58. The Court noted that "[u]nder the Secretary's chosen approach, exempt status requires that the employee be paid on a salary basis" and concluded that the Secretary's approach— grounded in the view that, generally speaking, true executive, administrative, or professional employees are not disciplined by piecemeal deductions from their pay—was "based on a permissible construction of the statute." *Id.* at 456-57.

6. Just as the Department has the authority to use a salary-basis test to help define and delimit who is employed in a "bona fide executive, administrative, or professional capacity," it necessarily also has the authority to elaborate what it

27

means to be paid on a salary basis. That is, the Department has the authority to promulgate regulations reflecting the status intrinsic to employment in a "bona fide executive, administrative, or professional capacity"—and ensuring that status is authentic—including by requiring employers pay either a true salary under 541.602(a) or a guarantee that functions like a true salary under 541.604(b).

Section 541.604(b)'s reasonable relationship requirement reasonably ensures an hourly paid worker exempted from the FLSA's overtime protections is paid a weekly guarantee that functions like a true salary. Thus, the worker—even though they are hourly—receives stable and predictable pay similar to a typical salaried employee, which befits employment in a "bona fide executive, administrative, or professional capacity." *Cf.* Weiss Rpt. 25-26 (deductions that reduce "payment [to] anything less than the full salary … seem[] to cast doubt upon the bona fide character of the employee's [EAP] status").

In other words, 541.604(b)'s reasonable relationship requirement is integral to effecting 541.604(b)'s regulatory tolerance that allows employers to compute an employee's actual pay on an hourly basis and still satisfy the salary-basis test. When the Department promulgated 541.604(b) in 2004—for the first time providing an express regulatory path for hourly workers to be exempt notwithstanding the salary-basis test—the Department resisted calls to forgo its proposed reasonable relationship requirement. *See* 69 Fed. Reg. at 22,183-84. The

28

reasonable relationship requirement, the Department explained, ensures an employer cannot pay employees based "upon the number of hours they work," "guarantee[] only the minimum required" salary level, and then "dock" the employee for absences due to a lack of work or other reasons. *Id.* "Such a pay system would be inconsistent with the salary basis concept and the salary guarantee would be nothing more than an illusion." *Id.* Likewise, in response to commenters' concerns that the new regulatory tolerance at 541.604(b) would result in employees who lacked both overtime protections and stable pay, the Department explained that the reasonable relationship test would ensure the guarantee paid to these employees functioned like a salary. *Id.*

Thus, the reasonable relationship requirement, and the salary-basis regulations as a whole, fall easily within the Department's express discretionary authority to "define[] and delimit[]" those employees exempt from overtime protection because they are employed in a "bona fide" EAP "capacity."

## CONCLUSION

The district court's judgment should be reversed.


Respectfully,


SEEMA NANDA                              /s/ Anne King
Solicitor of Labor                       ANNE W. KING
                                         Attorney
JENNIFER S. BRAND                        ERIN M. MOHAN

Associate Solicitor

RACHEL GOLDBERG
Counsel for Appellate Litigation

Senior Attorney
Fair Labor Standards Division
U.S. Department of Labor
200 Constitution Ave. N.W.
Room N-2716
Washington, DC 20210
(202) 693-7034
king.anne.w@dol.gov

*Counsel for Amicus Curiae*
*Acting Secretary of Labor*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type volume limitation of Fed R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed R. App. P. 32(f) and 6th Cir. R. 32(b), this brief contains 6,485 words.

This brief complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Office 365 using plain roman style, with exceptions for case names and emphasis, and using Times New Roman 14-point font, which is a proportionately spaced font, including serifs.

Date: August 1, 2024

/s/ Anne King
ANNE W. KING
Attorney
Fair Labor Standards Division
U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave, NW, N-2716
Washington, DC 20210
(202) 693-7034
king.anne.w@dol.gov

*Counsel for Amicus Curiae*
*Acting Secretary of Labor*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on August 1, 2024:

/s/ Anne King
ANNE W. KING
Attorney
Fair Labor Standards Division
U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave, NW, N-2716
Washington, DC 20210
(202) 693-7034
king.anne.w@dol.gov

*Counsel for Amicus Curiae*
*Acting Secretary of Labor*

# ADDENDUM

## TABLE OF CONTENTS

Excerpts from Stein Report (1940) ..................................................................... A-001

Excerpts from Weiss Report (1949) .................................................................. A-006

Excerpts from Proposed Amendments of the Fair Labor Standards Act of 1938: Hearings Before Subcomm. No. 4 of the H. Comm. on Educ. & Labor, 80th Cong. 1019 (1947) ......................................................................................A-011

Bona fide, 1 The Oxford English Dictionary 980 (1933) ................................ A-013

Capacity, 2 The Oxford English Dictionary 89 (1933).................................... A-016

Character, Webster's Collegiate Dictionary 170 (5th ed. 1942)...................... A-019

Position, Webster's Collegiate Dictionary 774 (5th ed. 1942) ........................ A-021

Relation, Funk and Wagnalls College Standard Dictionary 959 (1943) ......... A-023

UNITED STATES DEPARTMENT OF LABOR

WAGE AND HOUR DIVISION

WASHINGTON, D. C.

✛

# "Executive, Administrative, Professional . . . Outside Salesman" Redefined

✛

Effective October 24, 1940

Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON: 1940

A.001

individuals. Doubtless the present single definition could be so amplified as to include this latter group within its scope, but the regulations will be more easily understood and administered if a separate definition and delimitation is adopted for the term "administrative." [15]

## Section IV. SALARY TESTS

### SALARY TESTS FOR THE VARIOUS TYPES OF EMPLOYMENT

With few exceptions, there was general agreement on the appropriateness of a salary test for the terms "executive" and "administrative." [16] It was widely conceded that the terminology of section 13 (a) (1) implies a status which cannot be attained by those whose pay is close to or below the universal minimum envisaged in the act. It was further pointed out that the good faith specifically required by the act is best shown by the salary paid. A more detailed examination of these matters will be found below in sections VI and VII of this report.

The propriety of a salary test for professional employees was not given such full consideration at the hearings but insofar as the question was raised, there was considerable agreement on its appropriateness; this is discussed in section VIII. On the other hand, it was apparently universally assumed that there would be no salary test in the definition of "outside salesman"; this opinion is commented on in section IX.

The amounts proposed for the various definitions varied from nothing to $5,000. Further, a considerable number of definitions suggested different salary tests for the different terms, and this is recommended below. However, it was notable that only one of the proposals included differentials based on regional or population differences. This proposal, which has not been adopted in the recommendations, requires analysis.

### REGIONAL AND POPULATION SALARY DIFFERENTIALS

It was proposed by the American Bankers Association and various other parties that various salary minima be established. Generally speaking, these proposals suggested different minima for different sized communities. [17] Other proposals suggested either varying minima or a single minimum specifically designed to take into account some local customary salary base. Furthermore, some parties claimed that the Administrator did not have authority and should not establish

---

[15] Compare the distinction between "administration," "management," and "operation" in the article entitled "Administration and Organization, Functions of" in Pitman's Dictionary of Industrial Administration, vol. 1, p. 10. "Administration" is explained as the policy-making function, "management" as the policy-executing function.

[16] A salary qualification was included in proposed redefinitions submitted by the following: Shell Oil Co., Mid-Continent Oil & Gas Association, National Wholesale Druggists' Association, Council of National Wholesale Associations, Indiana Manufacturers' Association, United Wholesale Grocers Association Inc., American Retail Federation, Manufacturers' Association of Connecticut Inc., National Association of Manufacturers, National Association of Ornamental Metal Manufacturers, Oklahoma Stripper Well Association, Insulation Board Institute, Motion Pictures Producers and Distributors of America, National Small Business Men's Association, American Newspaper Publishers' Association, Edison Electric Institute, National Association of Broadcasters, and International Brotherhood of Electrical Workers. The alternative redefinitions of "executive" and "administrative" submitted by the American Bankers Association were based entirely on a salary qualification.

[17] The American Bankers' Association's alternative redefinition for "administrative" provided for six different salary qualifications varying from $80 a month for those employed in towns having a population of less than 10,000 to $200 a month for those employed in cities having a population of 1,000,000 or more.

though nonexecutive in nature, is unlike work performed by other employees of the same employer. Clearly, in the great majority of cases, the easiest test of the nonexempt nature of an employee's work is that it is performed habitually by nonexempt employees in the establishment. The Regulations were obviously drafted with this in mind and have been so interpreted by the Wage and Hour Division. There is an occasional situation where the literal application of the phrase "of the employer" has lead to dispute, as where the work of a shipping department is so subdivided that the supervisor himself carries on all the routine clerical work of the department, even though in other establishments such work is normally performed by nonexempt employees. To clarify this part of the Regulations and to prevent any such attempted evasion, it is recommended that the phrase "of the employer" be deleted.

### "NOT LESS THAN $30 A WEEK"

Criticism was also directed at the clause "who is compensated for his services at not less than $30 (exclusive of board, lodging, or other facilities) for a workweek. It was asserted by some that the Administrator has no authority to include a salary qualification. This view had little support.[65] There was indeed surprisingly wide agreement that a salary qualification in the definition of the term "executive" is a valuable and easily applied index to the "bona fide" character of the employment for which exemption is claimed and which must be of a "bona fide" executive character by the terms of the statute itself. This agreement was manifested both in oral testimony and in the terms of many of the proposed redefinitions.[66]

The basis of this agreement is easily explained. The term "executive" implies a certain prestige, status, and importance. Employees who qualify under the definition are denied the protection of the act. It must be assumed that they enjoy compensatory privileges and this assumption will clearly fail if they are not paid a salary substantially higher than the wages guaranteed as a mere minimum under section 6 of the act. In no other way can there be assurance that section 13 (a) (1) will not invite evasion of section 6 and section 7 for large numbers of workers to whom the wage-and-hour provisions should apply. Indeed, if an employer states that a particular employee is of sufficient importance to his firm to be classified as an "executive" employee and thereby exempt from the protection of the act, the best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them. The reasonableness and soundness of this conclusion is sustained by the record.

[65] Specific oral approval of the use of a salary test for "executive" or "executive" and "administrative" was expressed by 32 representatives of employers; specific direct disapproval was expressed by only 4 such representatives.
[66] A salary qualification was included in proposed redefinitions for "executive" or "executive" and "administrative" submitted by the following: Shell Oil Company; Mid-Continent Oil & Gas Association; National Wholesale Druggists' Association; Council of National Wholesale Associations; Indiana Manufacturers' Association; United Wholesale Grocers Association, Inc.; American Retail Federation; Manufacturers' Association of Connecticut, Inc.; National Association of Manufacturers; National Association of Ornamental Metal Manufacturers; Oklahoma Stripper Well Association; Insulation Board Institute; Motion Pictures Producers and Distributors of America; National Small Business Men's Association; American Newspaper Publishers' Association; Edison Electric Institute; National Association of Broadcasters; and International Brotherhood of Electrical Workers. The alternative redefinitions of "executive" and "administrative" submitted by the American Bankers Association were based entirely on a salary qualification.

at least at the present time, of data to show that the present $30 requirement has proved unsatisfactory, it would seem the part of wisdom to retain that figure. If future investigations show the desirability of an upward shift, the alteration can be made at that time.

### EXEMPTION APPLIES ONLY TO SALARIED EMPLOYEES

It is hardly necessary to restate what has always been the position of the Wage and Hour Division, namely, that the $30 for a workweek can be translated into equivalent terms for longer periods. Thus the requirement is fulfilled if the worker is paid $130 for a month or a comparable amount for any other pay period. However, the requirement is not fulfilled by the earnings of a person who is paid on an hourly basis. The shortest pay period which can properly be understood to be appropriate for a person employed in an executive capacity is obviously a weekly pay period and hourly paid employees should not be entitled to the exemption. The executive status in and of itself connotes at least the tenure implied by a weekly pay period as the very minimum. Accordingly, it is recommended that this clause in the definition read: "Who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities)." One final explanation may be made. In some instances persons who would otherwise qualify as executive employees, particularly sales managers and branch sales managers, are paid in part or in full by methods of compensation which include commissions, drawing accounts, and other items. In such instances the salary requirement will be met if the employee is guaranteed a net compensation of not less than $30 a week "free and clear." Similarly, if board and lodging are involved, there should be a "free and clear" payment of $30 each week in cash.

It was also suggested that the phrase should read "at not less than the rate of $30 * * * for a workweek."[79] It was explained that this proviso was to take care of certain executives who are hired on a part-time basis. This would seem quite unnecessary, however, for a person earning at such a rate for part-time work would clearly fulfill the minimum wage requirements of the act and, if his work were only part-time, would not be subject to overtime payments. The modification therefore seems unnecessary.

## Section VII. ADMINISTRATIVE EMPLOYEES

### RECOMMENDED DEFINITION

Section 541.2. Administrative.

The term "employee employed in a bona fide * * * administrative * * * capacity" in Section 13 (a) (1) of the act shall mean any employee—

(A) Who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

(B) (1) Who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

(2) Who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business opera-

---

[79] Statement of Noel Sargent, National Association of Manufacturers, record June 3–5, hearing, vol. III, p. 374.

tions, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(3) Whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment.

### DISTINCTION BETWEEN "EXECUTIVE" AND "ADMINISTRATIVE"

In section III of this report there is a discussion of the propriety of establishing separate definitions for the terms "executive" and "administrative." The conclusion is reached that, while separate definitions for the two terms are not essential, they are proper and can be conveniently used to describe two different groups of employees both of whose duties may warrant exemption. It also is pointed out in section III and more fully in section VI, that, although the two terms are in large degree overlapping in common usage,[80] it is both convenient and appropriate to limits the term "executive" to persons whose duties include some form of managerial authority—to persons who actually direct the work of other persons. The term "administrative" can thus be reserved for persons performing a variety of miscellaneous but important functions in business. This latter group is large in modern industrial practice, and includes, typically, such persons as personnel managers, credit managers, buyers, supervisors of machine tools, safety directors, claim agents, auditors, wage-rate analysts, tax experts, and many others.

It may be stated at this point that there are other possible ways of dividing the total sphere between "executive" and "administrative." For example, a considerable number of the proposed redefinitions submitted to the Administrator conceive of "administrative" as merely a lower form of "executive."[81] While such a distinction might be appropriate for some other purposes, it would be clearly inappropriate in establishing definitions for two terms which must not overlap if effect is to be given to each of the words in an act of Congress.[82] If "administrative" is to be defined merely as a lower form of "executive," all executives would qualify under the administrative definition, and the term itself might well be left out of the act and the Regulations.[83] Such a distinction, therefore, cannot be adopted for the purposes of section 13 (a) (1) of the act and Part 541 of the Regulations issued thereunder.

### MAIN ASPECTS OF THE PROBLEM

The problem of defining "employee employed in a bona fide administrative capacity" has two aspects. First, the definition must be sufficiently broad and general to include employees performing a great variety of tasks; and second, the definition must contain such delimiting requirements, principally a salary qualification, as will prevent abuse.

---

[80] Words and Phrases, op. cit., note 12.
[81] See, for example, the proposed redefinitions submitted by the National Wholesale Druggists' Association, Council of National Wholesale Associations, United Wholesale Grocers' Association, Inc., and Manufacturers Association of Connecticut, Inc.
[82] Effect can be given to both terms in a single definition, just as it can be denied to one term in two definitions.
[83] It was admitted by several of the employer representatives who appeared at the hearings that their proposed redefinitions of "administrative" rendered the definition of "executive" merely ornamental. For example, see statement of A. L. M. Wiggins, American Bankers' Association, record July 9, 10, hearing, vol. I, p. 31.

UNITED STATES DEPARTMENT OF LABOR

Maurice J. Tobin, *Secretary*

Wage and Hour and Public Contracts Divisions

Wm. R. McComb, *Administrator*

WASHINGTON, D. C.

# REPORT AND RECOMMENDATIONS

## ON PROPOSED REVISIONS OF REGULATIONS, PART 541

Defining the Terms

## "Executive" "Administrative"
## "Professional"
## "Local Retailing Capacity"
## "Outside Salesman"

. . . . . as contained in Section 13 (a) (1) of the Fair Labor Standards Act of 1938, providing exemptions from the wage and hour provisions of the act.

**June 1949**



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1949

A.006

tative requirements indicated above. I therefore recommend that the regulations be amended to include such provisos. Appropriate language to accomplish this purpose is included in the section of this report containing the complete text of the recommended regulations.

### "On a Salary * * * Basis"

The notice of hearing invited evidence on the need for revision or definition of the term "on a salary * * * basis." In response to this notice, a number of proposals relating to the "salary basis" requirements in the regulations were made in the course of the hearing. One of these was that the requirement of payment "on a salary * * * basis" be eliminated and that "average compensation" be used instead;[90] another, that employees be permitted to qualify for exemption even if paid an hourly wage.[91] Some witnesses suggested that the term "salary basis" be defined to mean payment of a fixed or guaranteed sum.[92] The evidence at the hearing showed clearly that bona fide executive, administrative, and professional employees are almost universally paid on a salary or fee basis. Compensation on a salary basis appears to have been almost universally recognized as the only method of payment consistent with the status implied by the term "bona fide" executive.[93] Similarly, payment on a salary (or fee) basis is one of the recognized attributes of administrative and professional employment. The proposals to eliminate the requirement and to apply an hourly rate or average earnings test may therefore be rejected as inconsistent with true executive, administrative or professional status.

A number of questions have arisen in the past in connection with the interpretation of the phrase "on a salary * * * basis" particularly with respect to the effect of deductions on the salaried status of an employee. The problem became of some importance during the war when the practice of making such deductions was adopted by some companies engaged in war production as a disciplinary measure to discourage absenteeism among executive and administrative employees.[94] This practice raised serious questions as to whether any employees to whom it was applied were actually employed "on a salary * * * basis" in accordance with the provisions of the regulations. Investigation by the Divisions indicated that this changed practice had become sufficiently widespread to warrant the conclusion that the wartime industrial practice differed from the pre-war practice and that such disciplinary deductions were no longer inconsistent with payment "on a salary * * * basis." In an effort to meet the wartime problems and to clarify the meaning of the term "on a salary * * * basis" the Divisions issued a restatement of position, the pertinent portion of which follows:

> An employee will be considered to be paid on a "salary basis" within the meaning of sections 541.1, 541.2, or 541.3 of Regulations, Part 541, if under his employment agreement he regularly receives each pay period, on a weekly, biweekly, semimonthly,

---

[90] National Association of Motor Bus Operators, transcript, p. 1792.
[91] Lennox Furnace Co., S. L. No. 9.
[92] Office Employees International Union, AFL, transcript, p. 2734; National Coal Association, transcript, p. 1473; and Central Pennsylvania Coal Producers' Association, transcript, p. 1581.
[93] See, for example, transcript, pp. 99–100, 134–135, 399, 707, 771–772, 999–1000, 1431–1432. The argument was also made, however, that the requirement of payment on a salary basis is illegal. See Exhibit No. 15.
[94] Transcript, pp. 28, 1253–1254.

24

monthly, or annual basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the number of hours worked or in the quantity or quality of the work performed during the pay period. However, the fact that less than this amount is paid for a particular pay period because disciplinary deductions are made for unreasonable absences would not in itself prove that the employee is not employed on a salary basis. On the other hand, since it is well recognized that bona fide executive, administrative, and professional employees are normally allowed some latitude with respect to the time spent at work, an employee will not be regarded as being paid on a salary basis if deductions are made for those types of absences ordinarily allowed such employees. For example, an employee is not being paid on a salary basis, if the employer makes deductions from his salary for an afternoon when he goes home early or when he occasionally takes a day off, unless, under the circumstances of a particular case, such absences must be considered unreasonable.[95]

As a result of this statement of position the problems created by the peculiar wartime conditions in many plants were solved but as an incident thereof, numerous administrative difficulties were encountered. For example, employers as well as the Divisions were faced with the need for determining in particular cases whether absences were reasonable or unreasonable and whether unreasonable absences included absences for longer periods than were allowed under established company plans for sick leave and "annual" leave. Since the answer to this latter question was determined to depend upon the reasonableness of the particular leave plan, employers had to decide for themselves and the Divisions in many instances were compelled to rule on specific leave plans to determine whether the leave plans were "reasonable" in nature. Employers were thus subject to considerable uncertainty prior to obtaining the opinion of the Divisions and the Divisions were faced with an undesirable administrative burden in giving such opinions. In my opinion, moreover, the building of such an elaborate structure of interpretation upon the simple phrase "on a salary * * * basis" should be avoided if possible in the interests of good administration.

The testimony at the hearings indicated that the practice of disciplining bona fide executive, administrative, and professional employees by making deductions from their salaries had been a wartime phenomenon, resulting from rapid upgrading, the pressure of long hours, and other temporary conditions. Such deductions are rarely made today. The disciplining of such employees in the rare instances where it is needed is usually accomplished in other ways than by deductions from salary.[96] There appears to be no present need for a definition of "salary basis" as difficult to apply as the one now followed by the Divisions, particularly since it is not consistent with the common understanding of the phrase as it applies to bona fide executive, administrative, and professional employees.[97] In view of the changed conditions, payment of anything less than the full salary

---

[95] Release A-9 dated August 24, 1944, "Payment on 'Salary Basis' for Executive, Administrative and Professional Employees Clarified."
[96] See, for example, transcript, pp. 23, 134-185, 399, 630-652, 1001, 1336-1337, 2759.
[97] Some representatives of employers urged that provision for deductions be retained. For example, see transcript, p. 1359.

25

seems to cast doubt upon the bona fide character of the employee's executive, administrative, or professional status.

I recommend that the official explanation of the regulations [98] make it clear that the term "on a salary  *  *  *  basis" requires that the employee receive his full salary for any week in which he performs any work without regard to the number of days or hours worked.[99] This recommendation may be accomplished by defining the term in the following language:

> An employee will be considered to be paid on a salary basis within the meaning of these regulations, if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the number of hours worked in the workweek or in the quality or quantity of the work performed.

The question may be raised in connection with the above recommendation whether the proposed definition of "salary basis" in all cases excludes employment on a commission basis, hourly rate, percentage of profit, or similar methods of payment resulting in varying amounts of weekly earnings. It should be noted that the language "a predetermined amount constituting all or part of his compensation" is used in the proposed definition. It is the purpose of this phrase to make it clear that additional compensation besides the salary is not inconsistent with the salary basis of payment. The requirement will be met, for example, by a branch manager who receives a salary of $75 or more per week and, in addition, a commission of 1 percent of the branch sales. The requirement will also be met by a branch manager who receives a percentage of the sales or profits of his branch, if the employment arrangement also includes a guarantee of at least the minimum weekly salary (or the equivalent for a monthly or other period) required by the regulations. Another type of situation in which the requirement will be met is that of an employee paid on a daily or shift basis, if the employment arrangement includes a provision that he will receive not less than the amount specified in the regulations in any week in which he performs any work.[100] The test of payment on a salary basis will not be met, however, if the salary is divided into two parts for the purpose of circumventing the requirement that the full salary must be paid in any week in which any work is performed. For example, a salary of $100 a week may not arbitrarily be divided into a guaranteed minimum of $75 paid in each week in which any work is performed, and an additional $25 which is made subject to deductions.

Failure to pay the full salary in the initial or terminal week of employment is not considered inconsistent with the salary basis of payment. In such weeks the payment of a proportionate part of the employee's salary for the time actually worked will meet the requirement. However, this should not be construed to mean that an employee is on a salary basis within the meaning of the regulations if he is employed occasionally for a few days and is paid a proportionate part of the

---

[98] Later in this report the recommendation is made to issue an explanatory bulletin together with the revised regulations.

[99] This recommendation is not intended to affect the Divisions' general position under the act that payment is not required in any week in which no work is performed.

[100] A representative of the coal industry testified that section foremen who are paid on a daily basis plus a minimum weekly guarantee enjoy all the privileges of salaried employees. Transcript, pp. 1522–1524.

A.009

# MINIMUM WAGE STANDARDS

## HEARINGS

**BEFORE**

## SUBCOMMITTEE NO. 4 OF THE COMMITTEE ON EDUCATION AND LABOR HOUSE OF REPRESENTATIVES

EIGHTIETH CONGRESS

FIRST SESSION

ON

**H. R. 40, H. R. 274, H. R. 284, H. R. 1422, H. R. 2578, H. R. 2980, H. R. 3764, H. R. 3766, H. R. 3886, and H. R. 3976**

BILLS HAVING FOR THEIR OBJECT THE RAISING OF THE MINIMUM WAGE STANDARDS OF THE FAIR LABOR STANDARDS ACT OF 1938

---

### VOLUME 1

JUNE 27, 30, JULY 1, 2, 7, 8, 9, 10, 11, AND 14, 1947

---

Printed for the use of the Committee on Education and Labor



# MINIMUM WAGE STANDARDS

---

### TUESDAY, OCTOBER 28, 1947

House of Representatives,
Subcommittee No. 4 of the
Committee on Education and Labor,
*Washington, D. C.*

The subcommittee met at 10 a. m., Hon. Wint Smith, presiding.

Mr. Smith. The hearing will please come to order.

Mr. McCann. Mr. Chairman, the first witness will be Mr. Thomas Howard.

The witness who was to have appeared this morning, Mr. Richard K. Lane has submitted a statement. It is not Mr. Howard's intention to read into the record that statement, but he would like to testify briefly himself with respect to the problems. May I ask at this time that the statement of Mr. Richard K. Lane, who is absent, be received in evidence and reproduced at this point.

Mr. Smith. Without objection it will be received.

(The statement referred to follows.)

#### STATEMENT OF RICHARD K. LANE, PRESIDENT, PUBLIC SERVICE CO. OF OKLAHOMA

I am Richard K. Lane, president of the Public Service Co., of Oklahoma. I am a member of the board of directors and chairman of the labor relations committee of the Chamber of Commerce of the United States and am appearing as a witness on behalf of that organization. Here with me are a few other witnesses who are presented by State chambers of commerce which are affiliated with the United States chamber as organization members. They are Mr. Frank Morfoot, assistant secretary and treasurer, Owens-Illinois Glass Co., Toledo, Ohio, and Mr. James West, of the Buckeye Steel Castings Co., Columbus, Ohio, both presented as witnesses by the Ohio Chamber of Commerce; Mr. Wilfred Bradshaw, director of personnel relations department, Indiana State Chamber of Commerce, presented as a witness by that organization; and Mr. Thomas Korb, assistant secretary and general counsel, of Harnischfeger Corp., Milwaukee, and Mr. Gilbert L. Klein, associate counsel, the Falk Corp., Milwaukee, both presented as witnesses by the Wisconsin State Chamber of Commerce.

Each of these gentlemen will present his own statement with regard to amendments that should be made to the Fair Labor Standards Act.

We are appearing as a group on this occasion, the United States chamber undertaking to present some of the more general objections of employers to the Fair Labor Standards Act, the other witnesses, some of the more specific objections in the light of their own experience.

We are presenting our testimony as a group in the belief that in the composite it will present a rounded discussion of difficulties with the law confronted by a substantial segment of business and industry. No one of the group will cover every point mentioned by the others. My own testimony for instance is confined to those phases of the law upon which the national chamber has a declared position.

##### THE NATIONAL CHAMBER'S INTEREST IN THE SUBJECT

The Chamber of Commerce of the United States is a federation of some 2,812 local chambers of commerce, trade associations, and other business organizations. These organization members, in turn, collectively comprise almost a million and

A.011

As I have said, the Administrator has found it necessary in the case of these exemptions to engage in lengthy discussions through his interpretative bulletins on their meaning. He has also gone to the lengths of specifying the conditions under which they may apply.

With respect to certain occupations (such as executive, administrative, and professional employees) where the Administrator has been expressly authorized to define the terms by issuance of his own rulings, past experience shows that the exercise of this rule-making power should be reviewed by this committee and that attention should be directed toward whatever amendments would serve to eliminate the hardships imposed by these rulings. Briefly, it may be said that most employers believe these rulings often fail to take necessary cognizance of business-world realities, serving instead to hamper commerce and harass businessmen, with maximum harassment, it would seem, for the smaller businessmen. The rulings are not fully consistent with each other. They have been deprived of certainty and definiteness as a consequence of a continuing effort to expand coverage by narrowing exemptions. And when particular rulings have been applied, this has been with a rigidity which has in many cases defeated the best efforts of businessmen to comply.

With regard to the exemption for "'executive, administrative, and professional employees," direct incorporation in the act of definitions required by these exemptions should be considered by Congress. It should also consider revising these provisions for such items as the relating of salary minimums upon which the exemptions are established to make each consistent with the other. Some latitude should be permitted in the matter of disciplinary deductions from salaries in order to avoid permanent loss of the exemption as the result of disciplinary deductions in any week which brings the amounts paid below the prescribed minimums. Similarly, rigidity in the application of rulings should be eliminated in determining precisely how much nonexempt work may be performed in any one week by executive or administrative employees before permanent loss of the exemption.

As to the matter of independent contractors beyond the coverage of the act by reason of their activities, the objective should be the attainment of as much certainty and definiteness as possible to make compliance certain rather than the gradual broadening of rulings with resultant uncertainty and extension of the act to those who are not truly employees. In considering how to rectify this uncertainty it is suggested that careful attention be given to the usual rules of law defining "independent contractors," and that language be incorporated in amending the act that will require application of these rules with consistency and certainty.

Careful examination should be made of the Administrator's rulings with regard to the exemption granted to employers who make annual wage guaranties of 2,080 hours' work yearly in a contract with a certified labor union. Here again, revision is needed to permit flexible and not rigid application of rulings. The effect of requiring mathematical exactitude in the number of hours worked by an employee in a guarantee period has destroyed most of the significance the exemption might have in ordinary business practice. In effect, this rigidity in making and applying administrative rulings as to the guaranteed-wage exemption has made a dead letter of this provision of the law.

It is well to note in addition the way in which the vague and indefinite language of the act has permitted the Administrator to extend its scope to bring in businesses of a purely local character. Most employers believe that the original intent of Congress was to leave the regulation of the wages and hours of such businesses to the State and local authorities in their legislative discretion. If so, the language of the act does not make that intent clear.

For example, the act exempts "retail or service establishments, the greater part of whose selling or servicing is in intrastate commerce." The requirements that have been set up to which local establishments must conform to have the benefit of these exemptions are onerous. For instance, a "service" establishment must be a "retail service" establishment in order to become exempt, although the act does not so limit it. A warehouse servicing a retail establishment is not exempt, although it may service an exempt business. Any establishment which receives more than 25 percent of its gross receipts from sales to commercial or industrial outlets is not exempt, although the figure was originally set at 50 percent by the Administrator. Likewise, an establishment must not sell more than 50 percent of its goods or services in interstate commerce to be exempt, and the concept of what constitutes commerce has been broadly extended so that local businesses are uncertain as to whether or not they are exempt from the act.

PE
1625
·N532
1933a
V·1

# THE OXFORD ENGLISH DICTIONARY

### BEING A CORRECTED RE-ISSUE

#### WITH AN

### INTRODUCTION, SUPPLEMENT, AND BIBLIOGRAPHY

OF

# A NEW

# ENGLISH DICTIONARY

## ON HISTORICAL PRINCIPLES

#### FOUNDED MAINLY ON THE MATERIALS COLLECTED BY

### The Philological Society

AND EDITED BY

### JAMES A. H. MURRAY, HENRY BRADLEY, W. A. CRAIGIE, C. T. ONIONS

## VOLUME I

## A–B

## OXFORD

### AT THE CLARENDON PRESS



U.S. DEPT. OF JUSTICE

MAY 27 1985

MAIN LIBRARY

A.013

*Oxford University Press, Walton Street, Oxford* OX2 6DP

OXFORD  LONDON  GLASGOW
NEW YORK  TORONTO  MELBOURNE  WELLINGTON
KUALA LUMPUR  SINGAPORE  JAKARTA  HONG KONG  TOKYO
DELHI  BOMBAY  CALCUTTA  MADRAS  KARACHI
IBADAN  NAIROBI  DAR ES SALAAM  CAPE TOWN

FIRST PUBLISHED 1933
REPRINTED 1961, 1970, 1978

PRINTED IN GREAT BRITAIN
AT THE UNIVERSITY PRESS, OXFORD
BY ERIC BUCKLEY
PRINTER TO THE UNIVERSITY

U.S. DEPT. OF JUSTICE

MAY 27 1983

*c* 1575 *Arte of Planting* 39 Specially the Peare called bon Chrestien. 1664 EVELYN *Kal. Hort.* (1729) 191 Winter Bergamot, Winter Bon-crestien. 1673 — *Rapin's Garden.* (1795) 312 In Amiterna's rule the Sabine bons Added Bon-rections to their former stores. 1798 MOTTEUX *Rabelais* IV. liv. I'll call them bon-christian or good-christian pears. 1869 LOUDON *Encycl. Gardening, Kitchen Pears* 60 Spanish bon Chrétien, long known in France, probably from Spain.

**Bon mot** (bõ̃ mo, *F.* mõ̃). [Fr. = 'good saying'.] A clever or witty saying ; a witticism, repartee.
1735 KING in *Swift's Lett.* (1768) IV. 115 What is he doing with his bons mots? 1768 COWPER *Truth* 307 The Scripture was his jest-book, whence he drew Bon mots to gall the Christian and the Jew. 1824 BYRON *Juan* XII. xvii, What unexpected woes Await those who have studied their bon mots. 1826 DISRAELI *Viv. Grey* IV. iv. 151 Come ! a bonmot. 1875 EMERSON *Lett. & Soc. Aims* vi. 146 The bonmots that circulate in Society.

**Bon-ton** (bõ̃-tõ̃). *arch.* Good style, good breeding ; polite or fashionable society ; the fashionable world. Also *attrib.*
1771 SMOLLETT *Humph. Cl.* (1815) 120 She lives in the bon ton .. and is visited by persons of the first fashion. 1807 W. IRVING *Salmag.* (1824) 358 To harangue the bon-ton reader. 1864 *Pall Mall G.* 1 Aug. 10/2 There was a word, or rather a phrase, in common use among them a century or so gone by which has fallen into desuetude with us. No one now speaks of *bon ton*.

**Bon-vivant** (bõ̃ vivã). *fem.* bonne vivante (bõ̃ vivãt). One fond of good living ; a gourmand.
1798 MAR. & R. L. EDGEWORTH *Pract. Educ.* (1822) I. 357 The sympathy of bon vivants is . very lively and sincere towards each other. 1824 BYRON *Juan* xv. lxiv, But though a 'bonne vivante'. Her stomach's not her peccant part. 1862 *Fraser's Mag.* July, 46 He was also a *bon-vivant*, a diner-out, and a story-teller.

See BONAIR, BONALLY, BON-BON, BONCHIEF, BONGRACE, BONGRE, BONHOMIE, BONHOMME; cf. BONNE.

**Bon, obs. f.** *boun*, BOUND, ready, and BOON.
† **Bonable,** *a. Obs. rare*⁻¹. [ A corruption of *bonnable, abominable*. (Also conjecturally referred to BAN to curse, BONE, and F. *bon* good.) ]
1575 J. STILL *Gamm. Gurton* III. ij, Diccon ! it is a vengeable knaue, gammer, 'tis a bonable whoreson.

**Bonace bark.** The bark of a Thymelaceous shrub (*Daphnopsis tinifolia*) found in Jamaica.
1756 P. BROWNE *Jamaica* 372 Bonace-bark Tree. The bark makes very good ropes.

**‖ Bona fide,** *adv.* and *adj.* [L. *bonā fidē* = 'with good faith'. Commonly anglicized in pronunciation as (bõ̃·nǎ fai·di), though classical scholars sometimes preserve the Latin quantity of the vowels, with or without the Latin vowel sounds.]
**A.** *adv.* In good faith, with sincerity; genuinely.
1542-3 *Act* 34 & 35 *Hen. VIII.*iv, The same to procure bona fide, without fraude. 1690 HOLLAND *Livy* xxxix. xxxiii. 830 He dealeth not soundly and bona fide [*neque cum fide agit*] in treaties of peace. 1722 *Lond. Gaz.* No. 6082/3 A Horse.. that is not Bona Fide his own. 1793 SMEATON *Edystone L.* §177 Our men were really and bonâ fide employed in the Edystone service.

**B.** *adj.* (orig. used with agent nouns, or those involving some quality, as in 'bona fide purchaser', 'bona fide poverty', 'bona fide traveller'.) Acting or done in good faith; sincere, genuine.
1788 J. POWELL *Devises* (1827) II. 27 As not to extend to bonâ fide purchasers for a valuable consideration. 1865 *Sat. Rev.* 5 Aug. 170/2 Interfering with the bonâ fide character of the proceeding. 1882 *Mod. Temp. Tract* No.50. 83 The bona fide poor are benefited.

Hence **Bo·nafi·dically,** *adv. nonce-wd.*
1821 SOUTHEY *Lett.* (1856) III. 314 Two men who love nonsense so cordially, and naturally, and bonâfidically.

**‖ Bona fides** (bõ̃·nǎ fai·dīz). *Law.* [L. *bona fides* good faith.] Good faith, freedom from intent to deceive.
1835 *Penny Cycl.* Supp. I. 214/1 Bona Fides is therefore opposed to fraud, and is a necessary ingredient in contracts. 1883 *Law Reports* XXIX. Chanc. Div. 468 It was said that this shewed bona fides on their part.

† **Bo·nage.** *Sc. Obs.* Also bonnage. [app. variant of BOONAGE, perh. confused with *bondage*.] Services rendered by a tenant to his landlord as part of rent.
1793 *Statist. Acc. Scotl.* I. 433 Bonnage is an obligation on the part of the tenant to cut down the proprietor's corn. This duty he must perform when called on. 1794 DONALDSON *Agric. Surv. Kincard.* 213 (JAM.) Another set of payments consisted in services, emphatically called Bonage (from bondage). These were exacted in seed-time, in ploughing and harrowing the proprietor's land .. in harvest, in cutting down his crop. 1861 C. INNES *Sk. Scotch Hist.* iii. 384 A lease of a half-merk land of Port Lochtay, with steelbow and 'bonage', according to custom.

† **Bonagh.** *Obs.* Also bonogh, bonough, burwnogh. [Irish : O'Reilly has *buana* a billeted soldier, also *buanadh* a soldier ; Keting in O'Curry II. 379 *buanadh* ' permanent soldiers of the Kings of Erinn'.] A permanent soldier.
1600 DYMMOKE *Ireland* (1843) 51 [Tyrone's] wealthe .. withe in shorte tyme exhausted, by the mayntenynge of his Bonaghs. 1633 T. STAFFORD *Pac. Hib.* iii. (1821) 43 Three hundred were Bonoughes, the best furnished men for the warre.

† **Bonaght,** *Obs.* Also 6-7 bonnaght, bonoghty, 7 bonaught, bonnogth. [Irish: O'Reilly has *buanacht* subsidy, quartering of soldiers ; O'Donovan *buanacht* military service.]

A tax or tribute formerly levied by Irish chiefs for the maintenance of soldiers.
1568 in *Dymmok Ireland* App. (1843) 88 Bonaghtes due to the Queens Majestie for her Galloglasses. 1586 J. HOOKER *Girald.Irel.* in *Holinshed* II. 78/2 The Irish impositions of quinie and liverie, carings, carriages .. bonnaght and such like. 1633 T. STAFFORD *Pac. Hib.* 11. (1821) 63 Large promises, for increasing his Bonnoght. *Hist.*(1810) III. xvii. 357 The barbarous practices of coshering and bonaght .. borrowed from those native chieftains.

† **Bonair(e,** *a. Obs.* Forms : 4-5 bonure, 4-6 boner(e, -aire, 5-our, -ayr, -oyre, 6 bonnair, 6-7 bonayre, 4-7 bonair. [a. OF. *bonnaire* gentle, courteous, affable, shortened from *debonnaire*. The accent shifted in ME.]
1. Well-fared, gentle, courteous, kind, complaisant. *c* 1300 *K. Alis.* 6732 With wordes bonere, Heom answerith swithe faire. *c* 1325 *E. E. Allit. P.* B 733 Blessed be þow .. so boner & bewed. *c* 1430 *Hym Gd. Wijf* 141/2e Dauid, 103 in *Babees Bk.* (1868) 41 To biter ne to honour with hem þat ben ne be. 1460 *Lybeaus Disc.* 1327 Sche ys meke and boneyre. 1542 *Sarum Manual* 64 To be bonere and buxum in bedde and at the borde. 1660 HOLLAND *Livy* iv. ii. 246 To haue been .. made more bonair and gratious. 1603 COCKERAM I, *Boneyre*, gentle, milde. 2696 PHILLIPS *Bonair*, see Debonair.
2. quasi-*adv.* = BONAIRLY.
*c* 1300 *Sir Tristr.* 1. xxix, The mariner spac bonair. *c* 1350 *Will. Palerne* 332 Here þe boxumly & bonore.

† **Bonairly,** *adv. Obs.* [f. prec. + -LY² ; cf. F. *bonnairement* (Cotgr.)] Courteously; meekly.
*c* 1340 *Cursor M.* 28871 (Fairf.) He þat can mare þen anoþer bone[r] [*other MSS.* debonerli] to teyche his broþer. 1340 *Ayenb.* 263 Lybbe we sobrelyche .. an bonayrelyche. 1522 *World & Child* in *Hazl. Dodsley* I. 243 Look ye bow bonerly to my bidding.

† **Bonairness,** *Obs.* [a. prec. + -NESS : cf. next.] Gentleness, mildness, courtesy.
*c* 1375 WYCLIF *Serm. Sel. Wks.* II. 137 Bonernesse, þat is a vertue of mekenesse, whanne men done as þei ben conseilid. 1382 — WYCLIF 1 *Cor.*ix. 21 Saul I come to 30u .. in spirit of bonernesse, or *myldenesse*?

† **Bonairty,** *Obs.* Forms : 4 boneryte, -erte, -airete. [a. OF. *bonerte*, later *bon n)aireté* (Cotgr.); see BONAIR.] = prec.
1303 R. BRUNNE *Handl. Synne* 1927 Twey wymmen .. Of so moche boneryte. *c* 1325 *E. E. Allit. P.* A. 761 He calde me to hys boneyte. 1386 CHAUCER *Melibeus* P656 Pyte and by bonairete. 2696 BLOUNT *Glossogr., Bonairite.*

† **Bonally, bonaillie** (bonæ·li, -æ·li). *Sc.* Also 5 (*A.*) bonalais, 8 bornaillie, bornmaillie, 9 bonnail. [ad. F. *bon good* + *aller* to go, going.] Good-speed, fare-well ; as in 'to drink one's bonallie' : cf. *boon voyage*, BOON *a.* 2.
*c* 1470 HENRY *Wallace* ix. 45 Bonalais drank rycht gladly In a morow, Syn lufit that ink. 17 .. *Tviid for Wise hter.* in *Statist. Acc. Scotl.* XVIII. 597 (JAM.) His son sailed .. and gave not his father his bonnaillie. 1821 SCOTT *Bigg-y. Mem. Leyden* in *Edin. Ann. Reg.* IV, A party of his friends had met .. to drink, in Scottish phrase, his Bonaillie. 1830 — *Favr. Blackness* 4, I drank his bonnail And farewell to Mackenzie, High Chief of Kintail.

**Bonano,** obs. form of BANANA.
‖ **Bonanza** (bonæ·nza). *U. S. colloq.* [Sp. ; = fair weather, prosperity, f. L. *bon-us* good.]
1. (See quot. The *bonanza* mines *par excellence* were the great silver ones on the Comstock lode. See *Sat. Rev.* 31 July 1866.)
1878 *N. Amer. Rev.* CXXVII. 12 The 'boss', the 'railroad king', and the bonanza Crœsus. 1881 RAYMOND *Mining Gloss., Bonanza,* in miners' phrase, good luck, or a body of rich ore. A mine is *in bonanza* when it is profitably producing ore.
*fig.* 1878 R. TAYLOR in *N. Amer. Rev.* CXXVI. 239 If silence be golden, he was a 'bonanza'. 1883 *Harper's Mag.* Nov. 940/1 This .. company .. proved .. a bonanza to its stockholders.
2. *attrib.*, as in bonanza farm, a farm which is a 'mine of wealth' ; one on a large scale with all modern scientific appliances ; so bonanza farmer.
1883 *Fisheries Exhib. Catal.* 79 The bonanza farms of America, where every kind of agricultural process is accomplished by steam. 1884 *Lisbon* (Dakota) *Star* 27 June, One of Ransom county's bonanza farmers.

**Bonapartism** (bõ̃·nǎpɑɹti·z'm). [see -ISM.] Attachment to the government and dynasty founded in France by Napoleon Bonaparte.
1815 T. JEFFERSON *Writ.* (1830) IV. 247 Disgraced by an association in opposition with the remains of Bonapartism. 1831 ARNOLD *Let.* in *Life & Corr.* (1844) I. v. 292 Nothing can be more opposite than Liberalism and Bonapartism. 1870 *Pall Mall G.* 17 Sept. 7 Germany will not move a finger in the cause of Bonapartism.

**Bonapartist** (bõ̃·nǎpɑɹtist), *sb.* and *a.* Also Buonapartist. [see -IST.]
**A.** *sb.* An adherent of the government and dynasty of the Bonapartes in France.
1815 J. W. CROKER in *Papers* (1884) I. iii. 61 We drove into Abbeville, where the garrison were savage Buonapartists. 1873 *Daily News* 21 Sept. 4/4 A blank denial of the Bonapartist sovereignty, hitherto a first article in the faith alike of Orleanists, Republicans, and Bonapartists.
**B.** *adj.* Adhering to Bonaparte or Bonapartism.
1869 *Pall Mall G.* 1 Sept. 2 A new Bonapartist pillar of Imperialism.

**Bonarets, bonarate,** Erroneous adaptations of the Russian *Baranetz*, the Scythian Lamb, a fabulous plant. See BAROMETZ.

1598 SYLVESTER *Du Bartas* II. I. (1641) 86/1 True Beasts, fast in the ground still sticking, Feeding on grass . Such as those Bonarets in Scythia bred Of slender seeds, and with green fodder fed. 1621 LODGE *Summ. Du Bartas* II. 33 Bonarate, which is as much to say as a little Lamb.

**Bonasges,** obs. form of BONAREGOS.

† **Bo·na-ro·ba.** *Obs.* [a. It. *buonaroba* 'as we say good stuffe, that is a good wholesome plumcheeked wench' (Florio), f. *buona* good, *roba* robe, dress, stuff, gear.] A wench ; 'a showy wanton'.
1597 SHAKS. 2 *Hen. IV*, iii. ii. 26 Wee knew where the Bona-Roba's were. 1680 DRYDEN *Kind Kpr.* i. i, Such food for Concupiscence, such Bona-Roba's.. 1837 NEW *Month xvi*, Your kinship is for a frolic into Alsatia? .. there are bona-robas to be found there.

† **Bona·sus, bona·ssus.** *Zool.* (Also 6 bonasius, bonasse.) [a. L. *bonasus,* a. Gr. *βόνασος* bison.] A genus (or species) of the ox family (*Bovidæ*) ; the BISON. See also AUROCHS.
1572 ROSSEWALL *Armorie* 363, The fielde is of 3 Diamond, a Bonaze Perle. .Bonasius is a Beaste in fourme like a Bull. 1774 GOLDSM. *Nat. Hist.* (1862) I. xiv. 24 The Cow kind, comprehending the Urus, the Buffalo, the Bison, and the Bonassus. 1790 BEWICK *Quadrupeds* (1824) 45 Whether the bonasus is the same Ox, the Bonasus or the Urus.

† **Bonaventure.** *Obs.* [app. ad. It. *buonaventura* good luck ; in quot. 1592 the name of a ship ; of the generic use no explanation appears.]
1. A kind of boat or ship.
1592 BRETON *Pilgr. Paradise* Wks. 1875-9 I. 15 The pilgrime must imbarke, Within a shippe the Buonaventure named. 1614 *Way to Wealth* in *Hard. Misc.* (Math.) III. 235 Busses, bonadventures, or fisher-ships.
2. 'The old outer mizen, long disused,' Smyth, *Sailor's Word-bk.*
*c* 1500 *Cocke Lorelles B.* (1843) 12 Some pulled up the bonauenture, Some to knowe the tope sayle dyde entre. 1626 CAPT. SMITH *Accid. Yng. Seamen* (Arb.) 15. 1704 J. HARRIS *Lex. Techn.* s.v. *Missen-Mast,* Some great Ships require two [missens] ; then that next the Main-mast is the Main-missen ; and that next the Poop, the Bonaventure-missen.
3. † An adventurer ; cf. BONEVENTUR,
1598 CHAPMAN *Blinde Begg.* Plays 1873 I. 14 Oh sir, you are but bonauenture, no right spanish percraue.

**Bonavist** (bo·nǎvist). Also 8 bonavist. *Ind.* It. *buona vista* good sight.] A species of tropical pulse (*Lablab vulgaris*).
1700 W. KING *Transactioneer,* The Dr. resolves many Doubts and Difficulties .. relating to the Bonavists, and the Dildos. 1750 G. HUGHES *Barbados* 216 The Buona Vista commonly called Bonny-vis. 1883 *Cavol. & Romdals. in Barbados,* Bonavist or a species of kidney beans.

† **Bon-bon** (bo·nībo·n, bō·nᵻbᵾn). [Fr. ; = good-good ; a name originating in the nursery ; cf. *goody*.]
1. A lozenge or other confection made of sugar.
1818 MOORE *Fudge Fam. Paris* iii, At the end of the Cottage : Where for haili they have bon-bons, and claret for ran. 1851 DISRAELI *Yng. Duke* j Lady Fitz-Pompey called twice a-week.. with a supply of pine-apples or bon-bons.
† 2. A dainty, a delicacy. *Obs.*
1821 *Cook's Oracle* (ed. 3) 330 [In a] Catalogue of Persian Bons Bons', there is a list of 28 differently flavoured Mustards. 1842 'Mrs Doo.' *Cook & Housewk. Man.* II. v. 235 *note,* They [onions] used to form the favourable bon-bons of the Highlander.

† **Bonbonnière** (bõbõnyeːɹ). [Fr., *f. bon-bon*.] A small fancy box to hold sweets.
1862 *Cornh. Mag.* V. 441 A bonbonnière full of sweetmeats. 1883 *Harper's Mag.* 809/1 A huge floral offering .. had innumerable pretty bonbonnières floating at its long ribbon.

**Bonc,** obs. form of BANK *sb.*²

**Bonce** (bɔns). [Origin unknown ; related to BOUNCE.] **a.** A large marble for playing with. **b.** A game played with such marbles.
1863 *Eng. England* I. 141 Bonce is played with very large marbles. One boy pitches his bonce, and another tries to strike it, each throwing by turns. 1865 FONNVALL in ROBER No. 146. 420/3 Little boys playing at bonce.

**Bonche,** obs. form of BUNCH.

† **Bonchief.** *Obs.* Forms : 4 bonchef, -chif, bonechief, 5 bonchefe, -cheef, -chyef, -chief, bonechief, bonnechewe. [f. F. *bon* good + *chief* 'head', hence 'end, issue' (see CHIEF) ; opposed to, and perhaps formed on analogy of, MISCHIEF.]
Good fortune, prosperity, easy circumstances.
*c* 1340 *Gaw. & Gr. Knt.* 1764 Al watz blis & bonchef, 1387 TREVISA *Higden* Rolls Ser. I. i. xli. 87 Good happes and boonchief, as wel as yuel happes and meschief. 1563 FOX *A. & M.* (1632) 87 I consented to do better after me for bonchief or mischief that may befal unto me in this life.

**Bond** (bɔnd), *sb.*¹ Also 4-5 boond, 5-7 boonde, 6 bound. [ME. *bond,* a phonetic var. of BAND *sb.*¹ cf. *land lond, stand stond,* etc. ), used interchangeably with it in early senses ; but *bond* preserved more distinctly the connexion with *bind, bound,* and is now the leading or exclusive form in branch II.]
**I.** *lit.* That with or by which a thing is bound.
1. Anything with which one's body or limbs are bound in restraint of personal liberty ; a shackle, chain, fetter ; manacle. *arch.* (and only in *pl.*).
*c* 1250 *Gen. & Ex.* 3702 Bondes ben leid on Symeon. *c* 1340 *Cursor M.* 7902 (Trin.) Alle his bondes he brake in two [*other MSS.* bandes, -is]. 1382 WYCLIF *Acts* xvi. 26 The bondis of alle ben loosyd. 1590 LEVINS *Manip.* 106 Bonde, *vinculum.* 1611 BIBLE *Acts* xxvi. 29 Altogether such as I am, except these bonds. 1785 COWPER *Task* ii. 36

# THE OXFORD ENGLISH

# DICTIONARY

BEING A CORRECTED RE-ISSUE

WITH AN

INTRODUCTION, SUPPLEMENT, AND BIBLIOGRAPHY

OF

## A NEW

## ENGLISH DICTIONARY

ON HISTORICAL PRINCIPLES

FOUNDED MAINLY ON THE MATERIALS COLLECTED BY

𝕿𝔥𝔢 𝕻𝔥𝔦𝔩𝔬𝔩𝔬𝔤𝔦𝔠𝔞𝔩 𝕾𝔬𝔠𝔦𝔢𝔱𝔶

VOLUME II

C

OXFORD

AT THE CLARENDON PRESS

1933

LIBRARY
NEW YORK
BOTANICAL
GARDEN

OXFORD
UNIVERSITY PRESS
AMEN HOUSE, E.C. 4
London   Edinburgh   Glasgow
Leipzig  New York  Toronto
Melbourne  Capetown  Bombay
Calcutta  Madras  Shanghai
HUMPHREY MILFORD
PUBLISHER TO THE
UNIVERSITY

PRINTED IN GREAT BRITAIN
AT THE UNIVERSITY PRESS, OXFORD
BY JOHN JOHNSON, PRINTER TO THE UNIVERSITY

A.017

or philosophick Solitude. **1752** JOHNSON *Rambl.* No. 207 ＊8 Anything .. capable of giving happiness. **1737-59** MILLER *Gard. Dict.*, The weaker trees being less capable to furnish a supply of nourishment. **1796** BP. WATSON *Apol. Bible* 338 You are capable of better things. **1863** E. NEALE *Anal. Th. & Nat.* 21 Animals must be capable of forming general thoughts. **1870** *Cassell's Techn. Educ.* IV. 94/3 A common compass-card, capable of free movement on a needle-point.

b. in a bad sense : Having the effrontery, depravity, wickedness for.

*a* **1680** S. CHARNOCK in Spurgeon *Treas. Dav.* Ps. x. 11 The criminal capable to practise them. **1777** BURKE *Corr.* (1844) II. 144 They who are capable of being forgers, are capable of being incendiaries. **1867** FREEMAN *Norm. Conq.* (1876) I. vi. 417 Eadric was capable of every wickedness.

6. *absol.* Having general capacity, intelligence, or ability ; qualified, gifted, able, competent.

**1606** SHAKS. *Tr. & Cr.* iii. iii. 310 Let me carry another to his Horse ; for that's the more capable creature. **1715** BURNET *Own Time* (1765) I. 31 The capablest man for business and the best speaker in that kingdom. **1748** MORGAN *Algiers* II. v. 294 Giving him, when capable, the whole management of all his domestic affairs. **1857** Mrs. JAMESON *Leg. Madonna* 337 Joseph as the vigilant and capable guardian of the Mother and the Child. **1871** BLACKMORE *Flower & Fawn* Plaisa i. 3 A more capable ..witness could not be desired.

† 7. Having some external, *esp.* a legal, capacity or qualification ; qualified, entitled ; in *Law*, qualified to hold or possess (property, etc.). Const. *of*, also *absol. Obs.*

**1605** SHAKS. *Lear* ii. i. 87 Of my land .. Ile worke the meanes To make thee capable. **1610** GULLIM *Heraldry* ii. v. (1660) 65 Bastards are not capable of their Fathers patrimony. **1633** BP. HALL *Hard Texts* 134 To keepe themselves from all legall pollution, that they might be capable of eating the passeouer. **1760** J. HUTCHINSON *Hist. Coll. Mass.* ii. (1765) 327 Protestants .. were capable of being made freemen. **1809** TOMLINS *Law Dict.* s.v. *Capacity*, An alien born ..is capable of personal estate ; but he is not capable of lands of inheritance. **1818** CRUISE *Digest* VI. 534 The devisee must be a person capable at the death of the devisor.

**Ca·pableness.**    [f. CAPABLE + -NESS.] The quality or condition of being capable (in various senses) ; capability.

**1589** GOLDING *De Mornay* xv. (1617) 261 So it [the mind] should euermore haue brought the ability and capablensense of it into act. **1594** CAREW *Huarte's Exam. Wits* (1616) 27 Whereunto these ventricles serue, and their large or narrow capablenesse for the reasonable soule, all shall bee told by vss. **1607** HIERON *Wks.* I. 283 Where there is no capablenesse of faith, there ought to bee no baptisme. **1680** R. MANSEL *Narr. Popish Plot* 7 She there examined his capablenesse for business. **1731** BAILEY, *Appeasableness*, capableness of being pacified.

**Capably** (kēˈpǎbli), *adv.*    [f. CAPABLE + -LY².] In a capable manner ; in a way that shows capacity ; with ability, ably.

**1885** *Manch. Exam.* 18 Mar. 3/2 The details .. are ..freshly conceived and capably handled.

† **Capa·ce.** *Obs.*    [ad. L. *capāx, capāci-*, f. *capĕre* to take.  See -ACIOUS.]  Ital. has *capace*, and there may have been a 16th c. F. *capace*, as the direct source.]    Able to take in (with the mind) or comprehend ; 'capacious' *of*.

**1555** CDL. POLE in Strype *Cranmer* (1694) App. x. 216 The doctrine of the presence prevayling .. aboue mans reason, may the capace of the same. **1658** LENNARD tr. *Charron's Wisd.* III. xiv. § 36 (1670) 439 When they are great and capace of that whereunto they were instructed.

† **Capa·cify.** *Obs. rare.*    [f. L. *capāci-* (see prec.) + -FY.]  = CAPACITATE.

*a* **1677** BARROW *Serm.* I. i. (R.) Capacifying us to enjoy .. all those good things.  *Ibid.* (1832) II. xliv. 462 [To] enjoy the benefits he is capacified and designed for.

**Capacious** (kēpēˈɪǝs),  *a.*    [f. L. *capāci-* (see above) + -OUS :  see -ACIOUS.]

† 1. Of such size as to take in or hold ; able to contain : having the capacity *of* or *to* (with infinitive).

**1664** RALEIGH *Hist. World* i. vi. (R.) The ark ..was sufficiently capacious to contain of all. **1624** MASSINGER *Parl. Love* iii. ii, There cannot be room in one lover's heart Capacious enough to entertain such multitudes of pleasures. **1634** HERBERT *Trav.* (1844) 154 A spacious harbour capacious of many thousand sail. **1656** COWLEY *Davideis* ii, What breast but thine capacious to receive The vast infusion ? **1744** AKENSIDE *Pleas. Imag.* ii. 244 Is thy short span Capacious of this universal frame? **1779** FORREST *Voy. N. Guinea* 230 A range of ..china jars, each capacious of, at least, twenty gallons.

2. Able to hold much ; roomy, spacious, wide.

**1634** HERBERT *Trav.* (1844) 67 The Lutherans have .. a mighty congregation, and a capacious church. **1656** H. *Hobbes' Elem. Philos.* (1839) 488 Nature has bestowed upon them wide and capacious ears. **1690** NORRIS *Beatitudes* (1694) I. 14 The Importunity of such craving and capacious Appetites. **1700** MAIDWELL in *Collect.* (Oxf. Hist. Soc.) I. 331 He will erect a capacious Auditorium. **1828** HAZLITT *Eng. Poets* iv. (1859) 93 The capacious soul of Shakspeare. **1856** SIR B. BRODIE *Psychol. Inq.* I. ii. 64 There is no animal whose memory is equally capacious with that of man. **1871** TEXTS *Growth Comm.* 202 Capacious quays.

3. Qualified, adapted or disposed for the reception *of, arch.* † Of capacity or qualified *to do* something (*obs.*).

**1677** GALE *Crt. Gentiles* IV. II. 430 The more capacious he is to order all means and affairs in subservience to his end and designe. **1692** *Poems in Bodleyan* 20 The girl began To grow capacious of a Man. **1709** *Brit. Apollo* II. No. 2. 3/1 Each Human Soul Capacious is to learn All Arts. **1725** POPE *Odyss.* v. 330 For the future sails

Supplied the cloth, capacious of the gales.  *Ibid.* XXIII. 201 Then posts capacious of the frame, I raise.  **1848** *40* SIR W. F. NAPIER *Penins. War* vii. 1 (Rtldg.) I. 328 A mind capacious of warlike affairs.  **1850** Mrs. BROWNING *Vis. Poets* cxliii, Their eyes capacious of remorse.

**Capaˈciously,** *adv.*    [f. prec. + -LY².]  In a capacious manner.

**1848** in TODD.  **1846** in WORCESTER.

**Capaˈciousness** (kēpēˈɪǝsnès).  [f. as prec. + -NESS.]  The quality of being capacious ; the power of holding or containing ; largeness, roominess, wide extent.  Cf. CAPACITY.

**1641** T. GOODWIN *Heart of Christ* 129 There is.. a greater capaciousnesse, vastnesse, and also quicknesse in his affections. **1658** ROWLAND *Moufet's Theat. Ins.* 1109 What thou speakest of the capaciousnesse of the place. **1685** H. MORE *Paralip. Prophet.* 189 By reason of the vast difference in their capaciousnesse. **1858** HAWTHORNE *Fr. & It. Jrnls.* I. 337 The vast capaciousness within St. Peter's is thrown away. **1874** PUSEY *Lent. Serm.* 98 We .. gain .. larger capaciousness For this endless Infinite love.

**Capacitate** (kēpæˈsitēit),  *v.*    [f. CAPACITY + -ATE ; see -ACITATE and -ATE².]

1. *trans.* To endow with capacity *for* or *to do* (something) ; to render capable ; to qualify, fit.

**1657** CROMWELL *Sp.* 8 Apr. (Carlyle) You can capacitate me to receive satisfaction in them. **1669** WORLIDGE *Syst. Agric.* ii. (1681) 10 It capacitates all sorts of Land ..for some of the Improvements mentioned. **1704** SWIFT *T. Tub* Pref., He will please to capacitate and prepare himself by these directions. **1710** NORRIS *Chr. Prud.* iv. 175 This Temper that naturally qualifies and capacitates us for Happiness. **1853** ROBERTSON *Serm.* Ser. III. iii. (1872) 32 Long and careful study .. capacitates him for his task.  *absol.* **1692** VILLIERS (Dk. Buckhm.), *Chances* (1714) 177 A Fund which might capacitate to make you Presents of my own.

2. To make legally capable ; to qualify in law.

**1657** CROMWELL *Sp.* 21 Apr. (Carlyle) It seems to capacitate all those who revolted from the parliament [to elect or be elected]. **1586** EVELYN *Mem.* (1857) II. 273, and March Came out a proclamation ..Capacitating Papists to be chosen into all offices of trust. *c* **1792** WILKES *Corr.* (1805) V. 190 To admit all the other sectaries to be capacitated equally with the members of the church of England.

Hence *Capaˈcitated* *ppl. a.*, *Capaˈcitating* *vbl. sb.* and *ppl. a.*

*a* **1652** J. SMITH *Sel. Disc.* ix. 417 The capacitating of man for converse with God. **1669** W. SIMPSON *Hydrol. Chym.* 270 Being convexhed into a proper capacitated Matrix.

**Capacitation** (kēpæsitǣˈiʃən).  [noun of action f. prec. ; see -ATION.]  A rendering capable.

**1898** DE QUINCEY *Miracles* Wks. VIII. 234 The .. supernatural birth .. was essential as a capacitation for the work to be performed.

b. *fig.*

**1578** *Chr. Prayers* in *Priv. Prayers* (1851) 513 That I may so drink of thee, according to my capacity, as I may live for ever. **1634** BP. HALL *Occas. Med.* Wks. (1808) 193 All favourable promises presuppose a capacity in the receiver. **1845** DE QUINCEY Wks. VI. 275 Men of genius have a larger capacity of happiness.

c. *Capacity for heat, moisture, etc. :* the power of absorbing heat, etc.  *Capacity of a conductor* (Electr.) : see *capat.*

**1793** T. BEDDOES *Calculus, &c.* 233 The great capacity of the arterial blood for heat. **1863** R. S. CULLEY *Pract. Telegr.* (1871) 293 By the Capacity of a Condenser or Cable is meant its power to receive a charge. **1878** HUXLEY *Physiogr.* 68 The hotter the air the greater its capacity for moisture. **1884** WATSON & BURBURY *Math. The. Electr. & Magn.* I. 160 The capacity of a conductor in presence of any other conductors is the charge upon it required to raise it to unit potential, when all the other conductors have potential zero.

2. Hence, Content : † a. *superficial,* Area (*obs.*).

b. *cubic,* Volume, solid content.  *Measure of capacity :* the measure applied to the content of a vessel, and to liquids, grain, or the like, which take the shape of that which holds them.

**1591** DIGGES *Pantom.* iii. 109 space wholly measure all equangle figures, what capacitie .. soeuer they bee of. *Ibid.* iv. xxiv, Rules for the inuention of his capacitie superficiall and solide. **1658** SIR T. BROWNE *Hydriot.* ii. (1736) 26 The present Urns were not of one Capacity, the Largest containing above a Gallon. **1697** DRYDEN *Virg.* Of a Capacity usually of a Gallon or more. **1858** FARADAY *Exp. Res.* vi. 11 A glass globe of the .. capacity .. of about 140 cubic inches. **1868** HERSCHEL *Fam. Lect. Sc.* 192 Our ordinary measures of length, weight and capacity.

† 3. A containing space, area, or volume.

**1649** BLITHE *Eng. Improv. Impr.* (1653) 155 Into a long square .. or an Ovall Capacity, or else into a Circular plot. **1756** BURKE *Subl. & B.* ii. iv, The whole capacity of the eye, vibrating in all its parts.

† b. *cap.* A space of three dimensions ; a hollow space, a cavity. *Obs.*

**1541** R. COPLAND *Galyen's Terap.* 2 G ij. In diuiding y´

tronke ..betwene the necke & the legges, is two great capacytees. **1594** T. B. *La Primaud. Fr. Acad.* ii. 216, There are two capacities or hollow places in the heart. **1601** HOLLAND *Pliny* xi. xxxvii. (1634) I. 316/2 There are two such chambers in nature. **1704** J. HARRIS *Lex. Techn.*, *Carcass*, is an Iron Case, or hollow Capacity, about the bigness of a Bomb.

*fig.*

**1587** GOLDING *De Mornay* xv. 248 Influence that floweth into the capasitie of our understanding. **1752** JOHNSON *Rambl.* No. 204 ＊3, I will fill the whole capacity of 103 soul with enjoyment.

4. Mental or intellectual receiving power ; ability to grasp or take in impressions, ideas, knowledge.

**1485** CAXTON *Chas. Gt.* 1 After the copacyte of my lytel entendement .. I haue ordeyned this book. **1580** FROST *Advt. C* 64 To apply himself to the capacitie of the scholer. **1671** MILTON *Samson* 1028 Capacity not raised to .. value what is best. **1713** BERKELEY *Min. Ph.* 144 He wants capacity to relish what true piety is. **1836-8** SIR W. HAMILTON *Metaph.* I. 253 Faculty is active power ; capacity is passive power.

5. Active power or force of mind ; mental ability, talent.

**1485** CAXTON *Paris & V.* Prol., My capacity is not sufficient for the proper handling .. of such subjects. **1597** HOOKER *Eccl. Pol.* v. lxvii. § 12 Hath not perhaps the wit or capacity to tread out so endless mazes. **1733** MARVELL *Corr.* cxxl. Wks. 1872 5 H. 413 Ready to .. serve them to the best of your capacytees. **1713** STEELE *Guardian* No. 17 ＊7 The fellow was a person of diligence and capacity. **1856** RUSKIN *Mod. Paint.* III. iv. x. § 22 Everlasting difference is set between one man's capacity and another's.

6. *gen.* The power, ability, or faculty for anything in particular.  Constr. *of, for,* or *inf.*

**1647** JER. TAYLOR *Lib. Proph.* i. 10 Enable him with the capacities of our Saviour and Lord. **1736** BUTLER *Anal.* i. i. 19 We are endued with Capacities of action, of happiness and misery. **1749** FIELDING *Tom Jones* ix. vii, The capacity of removing themselves from one place to another. **1833** H. MARTINEAU *Charmed Sea* i. 8 Sophia .. seemed to have lost the capacity of loving. **1869** BUCKLE *Civiliz.* II. i. 5 As society advanced there arose a capacity for self-protection. **1883** *Nature* 8 Mar. 435 The means of determining exact positions [in astronomy] and the capacity to reduce them.

7. The quality or condition of admitting or being open to action or treatment ; capability, possibility.

**1659** *Whole Duty Man* x. ii. 139 Several branches [of Justice] answerable to those capacities of injury. **1659** WORLIDGE *Syst. Agric.* iii. (1681) 17 Of Wet Meadows or Land under that capacity of being overflown. **1669** MARVELL *Corr.* cxiv. Wks. 1872-5 II. 274 You have yet .. a capacity of straitning the project. **1719** DE FOE *Crusoe* II. v. 106 To deprive them of the capacity of ever returning. **1792** SMEATON *Edystone L.* 3 50 That there should be a level area..or the capacity of making such a one. **1825** M´CULLOCH *Pol. Econ.* I. 23 Countries possessed of the greatest capacities of improvement. **1830** DAUBENY *Atom. The.* v. (ed. 2) 139 A capacity for infinite division.

† 8. Hence *To be in, put into* or *out of a capacity* : i.e. a position which enables, or renders capable. *Obs.*

**1649** JER. TAYLOR *Gt. Exemp.* ii. vi. 17 He instantly, if he be in capacity, leaves the wife of his bosom. **1669** MARVELL *Corr.* cxxxi. Wks. 1872-5 II. 296 The House .. not .. in a capacity to finish that bill before their meeting in February. **1672** WOOD *Life* (1848) 23 Being just .. in capacity of spending the remainder of his dayes in ease and quietness, he died. **1697** DAMPIER *Voy.* I. xiii. 352 The capacity we were then in, of settling ourselves at Mindanao. **1725** DE FOE *Voy. round World* (1840) 80 Not willing to put ourselves out of a capacity of planting further. **1809** DUNCAN *Trident* I. 185 Our [galley] alone was in a capacity to begin the engagement.

9. Position, condition, character, relation.

*a* **1649** CHAS. I. *Wks.* 295 He should be in a capacity of Honor. **1653** FULLER *Ch. Hist.* iii. 9 In what capacity these Jews came over, I find not. **1710** POPE *Lett.* in *Wks.* V. 84, I am ..dead in a natural capacity ..dead in a poetical capacity ..and dead in a civil capacity. **1747** HERVEY *Medit. & Contempl.* (1818) 166 The moon is .. ready to act in the capacity of a guide. **1835** BUCHANAN *Ch. Establishm.* I. 7 Channels through which the mind acts in their collective capacity, can be expressed. **1848** MACAULAY *Hist. Eng.* I. 364 The King, in his individual capacity, had very little to give. **1871** SMILES *Charac.* iv. (1876) 111.

† b. Relation, tenor, sense (of words) . *Obs.*

**1720** WATERLAND *Wind. Christ's Divin.* 102 Irenæus understood those Texts ..in that Capacity.

10. *Law,* Legal competency or qualification.  *To be in capacity :* to be legally qualified.

**1480** *Bury Wills* (1850) 66 Capacite in the lawe to purchase, take, and recceyue .. possessions. *a* **1626** BACON *On Civ. & Mor. Law* (1638) 40 Capacite of felony or treason, have no capacity to .. take, obtaine, or purchase. **1641** *Termis de la Ley* 44 Capacitie is when a man, or bodie politicke or corporate is able to give or to take other things, or to vse actions. **1803** STEPHEN *Laws Eng.* II. 168 The capacity of a man .. or alien may be enlarged by his becoming a denizen.

**Capacks,** *var.* of CAPAX *a. Obs.*

† **Capade** (kēpǣd).  [a. F. *capade,* f. *cap* head + -ADE.]  In *Hat-making.* (See def.)

**1797** P. WAKEFIELD *Mental Improv.* 1801 I. 85 These pieces, or capades, as they are called, being formed in this manner. **1875** URE *Dict. Arts* I. 784 The hat or capade .. formed .. into a conical shape.  *Obs.* rare.  [? F. *cape* cloak] to back ' this piece does not appear in French Dicts.]  Halliwell says *Captyhouse* occurs in same sense in MS. Arundel 249, lf. 88.]  ? A hood ; a piece to protect the back of the neck.



*N Webster*

Webster, Noah, 1758-1843.

THIN PAPER

# WEBSTER'S COLLEGIATE DICTIONARY

### FIFTH EDITION

*A Merriam-Webster*
REG. U.S. PAT. OFF.

THE LARGEST ABRIDGMENT OF

## WEBSTER'S NEW INTERNATIONAL DICTIONARY

#### SECOND EDITION



G. & C. MERRIAM CO., PUBLISHERS

SPRINGFIELD, MASS., U.S.A.

1942

A.019

Case: 24-5407    Document: 32    Filed: 08/01/2024    Page: 60

**chap'el** (chăp'ĕl; -'l), n. [OF. *chapele*, fr. LL. *cappella*, orig., a short cloak (*cappa*); later, a reliquary, chapel (because the building where St. Martin's cloak was preserved came to be called *cappella*).] **1.** A subordinate place of worship, esp. of Christian worship. **2.** A room, recess, or cell in a cathedral or other church, containing an altar and separately dedicated. **3.** A choir of singers belonging to a chapel, as of a prince. **4.** A chapel service, as at a college or university. **5.** *Print.* Formerly, a printing office. **6.** *Brit.* A place of worship used by others, esp. Nonconformists, than members of an established church.

**chap'er-on, chap'er-one** (shăp'ẽr-ōn), n. [F. *chaperon*.] A person, esp. a matron, who accompanies one or more young unmarried women in public for propriety. — v. t. To attend as a chaperon. — **chap'er-on'age** (-ōn'ĭj), n.

**chap'fall'en** (chŏp'fôl'ĕn; chăp'-), adj. Also **chop'fall'en** (chŏp'-). Having the lower chap, or jaw, drooping, as from weariness or humiliation.

**chap'i-ter** (chăp'ĭ-tẽr), n. *Arch.* A capital.

**chap'lain** (chăp'lĭn), n. [OF. *chapelain*, fr. ML., fr. *cappella*. See CHAPEL.] **1.** A clergyman who has a chapel. **2.** A clergyman officially attached to the army or navy, to some public institution, or to a family or court. **3.** A clergyman or layman chosen to conduct religious exercises for a society, etc. — **chap'lain-cy**, n. — **chap'lain-ship**, n.

**chap'let** (chăp'lĕt; -lĭt), n. [OF. *chapelet*, dim. fr. *chapel*, hat, garland, dim. fr. LL. *cappa*. See CAP.] **1.** A garland or wreath to be worn on the head. **2.** A string of beads; a necklace. **3.** *Arch.* A small molding, carved into beads, pearls, etc. **4.** *R.C.Ch.* A third of a rosary, or 55 (sometimes 50) beads, used in praying; also, the prayers recited over this. — **chap'let-ed**, adj.

**chap'man** (chăp'mǎn), n. [AS. *cēapman*, fr. *cēap* trade + *man* man.] **1.** *Archaic.* One who buys and sells; merchant; dealer. **2.** *Brit.* A peddler; hawker.

**chaps** (chăps; shăps), n. pl. *Colloq.* Short for CHAPARAJOS.

**chap'ter** (chăp'tẽr), n. [OF. *chapitre*, fr. L. *capitulum*, dim. of *caput* head.] **1.** A main division of a book, treatise, or the like. Abbr. *chap.*, *ch.*, or *c.* **2.** A regular assembly of the canons of a cathedral or collegiate church, or of canonesses, monks, members of an order, etc. **3.** A body or community of those who hold a chapter, or an organized branch or body of some society or fraternity. **4.** *Liturgies.* A short passage of Scripture between the last psalm and the hymn in lauds and the little hours. — v. t. To divide into, or arrange in, chapters, as a book.

**cha-qué'ta** (chä-kā'tä), n. [Sp.] A jacket; specif., a heavy jacket of leather or cloth worn by cowboys.

**char** (chär). Var. of CHARE.

**char,** n.; see PLURAL, *Note*, 3. Also **charr**. [Gael. *ceara*, lit., blood-colored, fr. *cear* blood. From its red belly.] Any of a genus (*Salvelinus*) of trout having small scales.

**char** (chär), v. t. & i.; CHARRED (chärd); CHAR'RING. **1.** To reduce to charcoal or carbon by burning; to burn. **2.** To burn slightly or partly; to scorch. — **Syn.** See SCORCH. — n. A charred substance; charcoal.

**char'a-banc'** (shâr'ȧ-băng'), **char'-a-banc'** (shâr'ȧ-băng'; -bäN'), n.; pl. CHARABANCS (-băngs'), CHAR-À-BANCS (-bäNz'; -băNz'). [F. *char à bancs*.] A long open vehicle, now specif., an open motor coach, having several rows of seats extending across its width and facing forward.

**char'ac-ter** (kăr'ǎk-tẽr; kǎr'ĭk-), n. [L., an instrument for marking, character, fr. Gr. *charaktēr*, fr. *charassein* to make sharp, to engrave.] **1.** A sign or token placed upon an object as an indication of some special fact, as ownership or origin; a mark, brand, or stamp. **2.** Hence: **a** A graphic symbol of any sort; esp., a graphic symbol employed in recording language, as a letter. **b** Writing; printing. **c** Style of writing or printing. **d** A private mode of writing; cipher. **3.** An attribute, quality, or property; esp., a distinguishing attribute. **4.** Quality, position, rank, or capacity; status; as, in his *character* as a son. **5.** The aggregate of distinctive qualities belonging to an individual or a race; the stamp of individuality impressed by nature, education, or habit. **6.** The estimate put upon a person or thing; reputation; repute. **7.** Moral vigor or firmness; esp. as acquired through self-discipline. **8.** A description or detailed account of the qualities of a person. **9.** A written statement as to behavior, habits, competency, etc., given by an employer to an employee. **10.** A person regarded as characterized by notable traits; a personage; sometimes, *Colloq.*, an odd or eccentric person. **11.** One of the persons of a drama or novel. — **Syn.** See DISPOSITION. — v. t. **1.** To engrave; inscribe; write. **2.** *Archaic.* To represent; figure. **b** To characterize. — **char'ac-ter-less**, adj.

**char'ac-ter-is'tic** (-ĭs'tĭk), adj. **1.** Pertaining to, or serving to constitute, the character; distinctive; typical. **2.** Serving as a character; serving to denote position in a scheme of classification. — **Syn.** See DISTINCTIVE. — n. A trait, quality, or property distinguishing an individual, group, or type. — **-is'ti-cal**, adj. — **-is'ti-cal-ly**, adv. — **Syn.** Quality, peculiarity, mark, lineament. — **Characteristic, trait, feature.** A characteristic is a mark or quality which characterizes, or distinguishes. A trait is a somewhat sharply defined characteristic, a feature is a prominent detail or part.

**char'ac-ter-ize** (kăr'ǎk-tẽr-īz; kǎr'ĭk-), v. t. **1.** To indi-

cate or delineate the character of; to describe. **2.** To be characteristic of; to distinguish as a trait. **3.** To give character to. — **char'ac-ter-i-za'tion**, n.

**char'ac-ter-y** (kăr'ǎk-tẽr-ĭ; kǎr'ĭk-; *formerly also accented* cha-rac'ter-y), n. Characters or symbols used to express thought.

**cha-rade'** (shȧ-rād' *or*, *esp. Brit.*, shȧ-räd'), n. [F.] A guessing game in which each syllable of a word to be found is represented by a tableau or by dramatic action.

**char'bon** (shär'bŏn; F. shär'bôN'), n. [F., coal, charbon.] The disease anthrax.

**char'coal** (chär'kōl'), n. **1.** A dark carbon prepared from vegetable or animal substances, as by charring wood in a kiln from which air is excluded. **2.** *Fine Arts.* **a** A piece or pencil of fine charcoal used as a drawing implement. **b** A charcoal drawing. — v. t. **1.** To mark, write, or draw with charcoal. **2.** To asphyxiate with charcoal fumes.

**chard** (chärd), n. [From F. *carde* chard, fr. Pr. *carde*.] **1.** The tender leafstalks of the artichoke, blanched for table use. **2.** A kind of beet (*Beta vulgaris cicla*) with large leaves and succulent stalks, often cooked as a potherb.

**chare** (châr), **char** (chär), n. [AS. *cerr*, *cyrr*, turn, occasion, business.] A turn or occasional piece of work; a chore. — v. i.; CHARED (chärd) *or* CHARRED (chärd); CHAR'ING *or* CHAR'RING. To do odd jobs; to work as charwoman.

**charge** (chärj), v. t.; CHARGED (chärjd); CHARG'ING (chärj'-ĭng). [OF. *chargier*, deriv. of L. *carrus* wagon.] **1.** To lay or put a load on or in; to load. **2.** To place a charge, as of powder, within or upon. **3.** To task or load (with) mentally; to burden. **4.** To command, instruct, or exhort with authority. **5.** To accuse; to make a charge against. **6.** To impute or ascribe; to lay to one's charge. **7.** To bear down upon; to attack. **8.** To subject to a pecuniary charge or liability; to make liable for. **9.** To fix or demand as a price; also, to set a price on. **10.** To place something to the account of as a debit; to debit. **11.** *Elec.* To restore (the active materials in a battery) by the passage of a direct current through it in the opposite direction to that of discharge. **12.** *Her.* To assume as a bearing; as, he charges three roses or; to place a bearing on; as, he charges his shield with three roses or. **13.** *Mil.* To bring (a weapon) to a position fitted for attack; level. — v. i. **1.** To make a charge, or impetuous onset; to rush. **2.** To demand or set a price. **3.** To deliver a charge, as a bishop. **4.** To squat, with its head on its forepaws; — said of a dog. — **Syn.** Charge, accuse. Charge implies something laid on one, and often connotes formality or gravity; accuse is commonly more immediate and personal, and often suggests rather directness or sharpness of imputation or censure. See REFER.

— n. [OF.] **1.** A load; a burden. **2.** The quantity, as of powder, electricity, ore, fuel, etc., which any apparatus, as a gun, battery, furnace, etc., is intended to receive and fitted to hold at one time. **3.** A duty or task laid upon a person; responsibility; obligation. **4.** An order; a command. **5.** An accusation of a wrong or offense; allegation. **6.** An address containing instruction or exhortation; as, the *charge* of a bishop to his clergy. **7.** A person or thing entrusted to the care of another. **8.** Pecuniary burden; expense. **9.** The price demanded for a thing or service. **10.** *Bookkeeping.* An entry or account of something due from one party to another. **11.** *Her.* A figure borne on the field; a bearing. **12.** *Law.* At the close of a trial, the statement made by the judge to the jury of the principles of law involved, etc. **13.** *Mil.* An act of rushing upon an enemy; an attack; also, signal for attack. — **Syn.** Custody, keeping; concern; management; expense; cost; assault, attack, onset; instruction; accusation. See PRICE.

**char'gé'** (shär'zhā'; F. shär'zhā'), n. [F.] A chargé d'affaires.

**charge'a-ble** (chär'jȧ-b'l), adj. **1.** *Obs.* a Burdensome. **b** Weighty. **c** Responsible. **2.** That may be charged; as, a man *chargeable* with murder.

**char'gé' d'af-faires'** (shär'zhā' dȧ-fâr'; F. shär'zhā' dȧ'-fâr'), n.; pl. CHARGÉS D'AFFAIRES (shär'zhāz' dȧ-fâr'; F. shär'zhā' dȧ'fâr'). [F., charged with affairs.] A temporary substitute for an ambassador or minister plenipotentiary; also, a diplomatic representative of an inferior grade, accredited by the government of one state to the minister of foreign affairs of another.

**charge'ful** (chärj'fŏŏl; -f'l), adj. *Obs.* Burdensome; expensive.

**charg'er** (chär'jẽr), n. *Archaic.* A large flat dish or platter for carrying meat.

**charg'er,** n. One that charges; as: **a** A horse trained to charge; an officer's mount. **b** *Elec.* A device for charging storage batteries.

**char'i-ly** (châr'ĭ-lĭ), adv. In a chary manner; carefully.

**char'i-ness** (-nĕs; -nĭs), n. **1.** Quality of being chary; caution. **2.** Carefully preserved state; integrity.

**char'i-ot** (chăr'ĭ-ŏt), n. [OF., fr. *char* car.] A wheeled vehicle; as: **a** Among the ancients, a two-wheeled vehicle for war, racing, processions, etc. **b** A light four-wheeled pleasure or state carriage.



Ancient Greek Chariot.

A.020



*N Webster*

Webster, Noah, 1758-1843.

THIN PAPER

# WEBSTER'S COLLEGIATE DICTIONARY

### FIFTH EDITION

*A Merriam-Webster*
REG. U.S. PAT. OFF.

THE LARGEST ABRIDGMENT OF

## WEBSTER'S NEW INTERNATIONAL DICTIONARY

#### SECOND EDITION



**G. & C. MERRIAM CO., PUBLISHERS**
SPRINGFIELD, MASS., U.S.A.
1942

A.021

Case: 24-5407   Document: 32   Filed: 08/01/2024   Page: 62

**por·tiere'** (pōr·tyâr'; -ti·âr'; F. pôr'tyär'), n. [F. portière, fr. porte gate.] A curtain hanging across a doorway.

**por'tion** (pōr'shŭn; 70), n. [OF., fr. L. portio.] **1.** An allotted part; specif.: **a** A share received by gift or inheritance; a patrimony. **b** A dowry. **c** A piece or amount served or regarded as sufficient for one person; a helping. **2.** One's lot or destiny. **3.** A part of a whole; as: **a** A constituent part. **b** A part detached from a whole. — **Syn.** See PART. — v. t. [OF. portionner.] **1.** To divide into portions; to distribute in shares. **2.** To allot as a portion; to dower. — **por'tion·less,** adj.

**por'tion·er** (-ẽr), n. One who portions or has a portion.

**Port'land ce·ment'** (pōrt'lănd; 70). [From Isle of Portland, Eng.] A hydraulic cement made by burning and grinding a mixture of pure limestone and clay, or of other aluminous material.

**port'ly** (pōrt'lĭ), adj.; PORT'LI·ER (-lĭ·ẽr); PORT'LI·EST. [From PORT demeanor.] Dignified in appearance; stately; imposing, now esp. on account of bulk; corpulent. — **Syn.** See STOUT. — **port'li·ness,** n.

**port·man·teau** (pōrt·măn'tō), n.; pl. -TEAUS (-tōz), -TEAUX (Ŭt. -tōz). [F. porte-manteau, fr. porter to carry + manteau mantle.] Chiefly Brit. A traveling bag or case, orig. one adapted for use on horseback; now, esp., a large suitcase.

**portmanteau word.** A word formed by arbitrary combination of two words (slithy, from slimy and lithe).

**Por'to Ri'can** (pōr'tō rē'kăn). Var. of PUERTO RICAN.

**por'trait** (pōr'trĭt; -trāt; 70), n. [F., orig. past part. of portraire to portray.] **1.** A pictorial representation of a person, esp. of the face, painted, drawn, engraved, photographed, or the like; a likeness, esp. one painted from life. **2.** Lifelike or realistic delineation, description, etc. — **por'trait·ist** (pōr'trĭt·ĭst), n. One who makes busts, paints, portraits.

**por·trai·ture** (-trā·tṛr), n. [OF.] **1.** Act, practice, or art of making portraits; portrayal. **2.** A portrait.

**por·tray'** (pōr·trā'; 70), v. t. [OF. portraire, fr. L. protrahere, -tractum, to draw forth.] **1.** To represent by drawing, painting engraving, etc.; to make a picture or image of; delineate; depict. **2.** To describe or depict in words; to describe vividly; also, to represent dramatically; act. — **por·tray'a·ble,** adj. — **por·tray'er,** n.

**por·tray'al** (-ăl), n. **1.** Act, process, or result of portraying; delineation; a portrait.

**por'tress** (pōr'trĕs; -trĭs), **por'ter·ess** (pōr'tẽr·ĕs; -ĭs), n. fem. of PORTER.

**For'tu·guese** (pōr'tṵ·gēz; -gēs), adj. from PORTUGAL, Gas. — n. **1.** sing. & pl. One of the people of Portugal, usually considered as typical representatives of the Iberian branch of the Mediterranean race. **2.** The Romance language of Portugal and Brazil.

**Portuguese man-of-war.** Any of several large siphonophores (genus Physalia) having a large, bladderlike pneumatophore by means of which they float at the surface.

**por'tu·lac·a** (pōr'tṵ·lăk'à; 70), n. [L., purslane.] Any of a genus (Portulaca, pron. -lāk'à; -lăk'à) of mainly tropical succulent herbs including the common purslane (P. oleracea) and the garden portulaca (P. grandiflora).

**por'tu·la·ca'ceous** (-lá·kā'shŭs), adj. Belonging to a family (Portulacaceae) of usually succulent herbs including the portulacas and spring beauties.

**pose** (pōz), v. t. [From appose, for oppose.] **1.** Obs. To question. **2.** To puzzle by or as by questioning; to nonplus.

**pose,** v. t. [OF. poser to place, put, fr. L. pausare to pause, in LL. also, to place, fr. L. pausa a pause; confused in LL., F., and E. with L. ponere, posui, positum, to put, place.] **1.** To lay down; to claim; as, to pose a poem as Shelley's. **2.** To propose or propound, as a question. **3.** To place in a studied attitude, with attention to posture and arrangement of draperies; as, to pose a model. — v. i. To assume a pose, or studied attitude, for a picture or as an affectation; to attitudinize. — n. **1.** A fixed or sustained posture, as for artistic effect or in affectation. **2.** A deliberately assumed mood; as, his cheerfulness is not a pose. **3.** Posing; attitudinizing. — **Syn.** See POSITION.

**Po·sei'don** (pō·sī'dŏn), n. [Lrs, fr. Gr. Poseidōn.] Gr. Relig. The god of the sea and of the watery element generally, son of Cronus and Rhea and husband of Amphitrite, worshiped as god of horses; his attributes include the dolphin, the horse, and the trident. See NEPTUNE.

**pos'er** (pōz'ẽr), n. A baffling question; a puzzle.

**pos'er,** n. Also **po·seur'** (pō·zûr'). One who poses or attitudinizes.

**pos'it** (pōz'ĭt), v. t. [L. ponere, positum, to place.] **1.** To set firmly or fixedly. **2.** Philos. To postulate or assert as fact (that which is immediate or indemonstrable); — contrasted with infer.

**po·si'tion** (pō·zĭsh'ŭn), n. [F., fr. L. positio, fr. ponere, positum, to put, place.] **1.** A positing, or placing. **2.** The manner in which anything is placed, arranged, or disposed; hence: **a** Posture or attitude. **b** Manner or way of viewing something; mental attitude; as, to define one's position. **c** Site; place; station; hence, proper place; as, the position of a post. **d** Relative place, situation, or stand of a person; social or official rank or status; as, a person of position. **e** Office; employment; situation; as, to lose one's position. **f** Spot, place, or condition that gives one

the advantage over another; as, to maneuver for position. **3.** Gr. & Lat. Pros. The state of having a short vowel followed by two consonants or a double consonant, by which, as, in vũdvũnt the syllables are long by position. (as z c) — **tion·al,** adj.

**Syn.** Position, posture, attitude, poss. Position denotes the way in which a thing is placed or disposed, esp. as to other things; posture the disposition of the parts of the body as to one another; attitude is posture esp. as unconsciously expressive or intentionally assumed; a pose is an attitude, esp. as assumed for effect. — v. t. To put in or as the proper position; also, to locate.

**pos'i·tive** (pōz'ĭ·tĭv), adj. [OF. positif, fr. L. positivus.] **1.** Definitely or formally laid down or imposed; explicitly expressed; admitting of no doubt, qualification, or discretion; peremptory; explicit; definite; decisive; as, positive law; a positive command. **2.** Colloq., downright; absolute; as, a positive promise. **3.** Concerned with matters of practical experience, not speculative or theoretical. **4.** Independent of changing circumstances or relations; not relative or comparative. **5.** Confident; certain; sometimes, overconfident; dogmatic. **6.** Characterized by acceptance or approval; affirmative. **5.** Having a real existence, energy, character, or the like; actual; concrete; as, positive good. **6.** Gram. Affirming the presence of the organism or condition in question; as, a positive diphtheria culture. **b** Biol. Directed or moving toward a source of stimulation; as, a positive taxis. **7.** Elec. Having as the elementary unit the proton having on its surface more protons than electrons. **8.** Gram. Of an adjective or adverb in its degree, simple form denoting no relation to increase or diminution. **9.** Mach. Designating, or pertaining to, a motion or device which is definite, unyielding, constant, or certain in its action, as determined by unyielding parts or exactly controlled movements. **10.** Math. Physics, etc. — n. **1.** A positive quantity. **b** Reckoned or proceeding in a direction arbitrarily or conventionally taken as that of increase, onward motion, or the like. **11.** Philos. Affirmative and constructive; — disting. from skeptical. **b** Empirical; subject to scientific verification; — disting. from speculative. **12.** Photog. Reproducing light and shade as in the original subject. — **Syn.** See SURE. — n. **1.** That which is positive; as: **a** Gram. The positive degree, or form denoting it. **b** Photog. A print from a negative. — **pos'i·tive·ly,** adv. — **pos'i·tive·ness,** n.

**pos'i·tiv·ism** (pōz'ĭ·tĭv·ĭz'm), n. **1.** Quality or state of being positive; certainty. **2.** [F.] A system of philosophy originated by Auguste Comte which excludes everything but the natural phenomena or properties of knowable things, together with their relations of coexistence and succession. — **pos'i·tiv·ist** (-ĭst), adj. & n. — **tiv·is'tic** (-ĭs'tĭk), adj.

**pos'se** (pōs'ē), n. [ML.; in L., infin., to be able.] Law. Short for POSSE COMITATUS. A force with legal authority; an armed band.

**[pos'se co·mi·ta'tus** (kŏm'ĭ·tā'tŭs). [LL., suffix to be able, to have power, in ML., power + ML. comitatus a county.] **1.** Law. The entire body of inhabitants liable to be summoned by the sheriff to assist in preserving the public peace; also, the body of persons so summoned. = POSSE, 2.

**pos·sess'** (pō·zĕs'), v. t. [See POSSESSION.] **1.** To put in possession; to make the owner or holder, as of property, power, knowledge, etc. **2.** To have and hold as property; to be master of; to own. **3.** To have as a property, adjunct, attribute, or the like; as, to possess information. **3.** Archaic. To gain; seize. **b** To bring under the control or influence (of some passion, idea, or the like); as, to possess one with indignation. **c** To inform; acquaint. **4.** To enter into and influence powerfully; to dominate; as, he was possessed with rage. **5.** To maintain in a condition of control or tranquillity; as, to possess one's soul in patience. — **Syn.** See HAVE. — **Ant.** LACK.

**pos·ses'sion** (pō·zĕsh'ŭn), n. [OF. possession, fr. L. possessio, fr. possidere, possessum, to possess.] **1.** Act or state of possessing; also, the state of being possessed. **2.** The thing possessed; in pl., property in the aggregate; wealth; dominion; as, foreign possessions. **3.** Fact or state of being dominated by an extraneous personality, a demon, passion, idea, or the like. **4.** Fact or state of being under one's own control. — **Syn.** Ownership, hold, control, mastery.

**pos·ses'sive** (-zĕs'ĭv), adj. **1.** Of or tending to possession; manifesting the desire to possess. **2.** Gram. Designating or pertaining to the case in English denoting ownership or some relation felt as analogous (Dick's hat; the pear's flavor); also, designating a pronoun or construction, as with of, expressive of the same relation. Abbr. poss. — n. Gram. **a** The possessive case or a word in that case; also, an equivalent case phrase (a story of Lincoln's), often called a double possessive. **b** A possessive pronoun.

**☞** Present treatment of the apostrophe in forming possessives: (1) Nouns not ending in a sibilant sound, whether singular or plural, add 's (dog's; men's). (2) Singular nouns ending in an s- or z- sound, when of one syllable, add 's (James's); when of two or more syllables taking accent on the last, add 's if the last syllable is a Hortense's; when of two or more syllables taking no accent on the last, add 's if the last syllable is not preceded by an s- or z- sound (Thomas's), otherwise add only the apostrophe (Moses'). (3) Plural nouns ending in an s- or z- sound, when the last syllable is preceded by an s- or z- sound,

# FUNK AND WAGNALLS

# COLLEGE "STANDARD"

[Reg. U. S. Pat. Off.]

# DICTIONARY

OF THE

## ENGLISH LANGUAGE

DESIGNED TO GIVE THE ORTHOGRAPHY, PRONUNCIATION, MEANING, AND ETYMOLOGY OF OVER 140,000 WORDS AND PHRASES IN THE SPEECH AND LITERATURE OF THE ENGLISH-SPEAKING PEOPLES, WITH SYNONYMS, ANTONYMS, AND PREPOSITIONS

*CONTAINING ALSO AN APPENDIX OF FOREIGN PHRASES USED IN ENGLISH SPEECH AND LITERATURE*

2,500 PICTORIAL ILLUSTRATIONS

*Abridged from the Funk & Wagnalls New Standard Dictionary of the English Language*

WILCOX & FOLLETT CO.

PUBLISHERS · 1943 · CHICAGO

PROPERTY OF THE
UNITED STATES
GOVERNMENT

A.023

COPYRIGHT, 1943 BY
FUNK & WAGNALLS COMPANY

PREVIOUS EDITIONS COPYRIGHT,
1922, 1923, 1924, 1925, 1926, 1927, 1928, 1929, 1931, 1933, 1934, 1936, 1937, 1938, 1939, 1940, 1941, AND 1942

BY
FUNK & WAGNALLS COMPANY
[Printed in the United States of America]

This book is manufactured under wartime conditions
in conformity with all government regulations con-
trolling the use of paper and other materials

Copyright Under the Articles of the Copyright Convention
of the Pan-American Republics and the United States

958

**re″in-force′, -ᵐent,** etc.  Same as REENFORCE, etc.

**reins,** 1 rēnz; 2 rēɳᶎ, *n. pl.*  1. The kidneys.  2. The inward parts; hence, the affections and passions, formerly thought to have their seat in the loins.  [OF., < L. ren, kidney.]

**re″in-stall′,** 1 rī″in-stôl′; 2 rē″in-stal′, *vt.*  To install again.  **re″in-stal′; —re″in-stal′[or -stall′]ment,** *n.*   **re″in-stal-la′— tion,** *n.*

**re″in-state′,** 1 rī″in-stāt′; 2 rē″in-stāt′, *vt.*  1. To restore to a former state or position.  2. In fire insurance, to replace or repair, as damaged property, in lieu of paying its value.  **—re″in-state′ment,** *n.*   **re″in-sta′tion[,** *n.*

**re″in-sur′ance,** 1 rī″in-ᶊhûr′ans; 2 rē″in-ᶊhur′anᶎ, *n.*  1. An insurance effected by an insurer against a risk that he has previously assumed.  2. The act of insuring again; a second insurance.

**re″in-sure′,** 1 rī″in-ᶊhûr′; 2 rē″in-ᶊhur′, *vt.*  [-SURED′; -SUR′ING.]  *Law.*  1. To protect by reinsurance (the risk on a policy already issued).  2. To insure anew.

**reird,** 1 rīrd; 2 rērd, *n.*  [Scot.]  Same as BAIRD.

**reise,** 1 rīs; 2 rēs, *n.*  [Scot.]  A twig; brush; brushwood.  —*v.*

**reist,** 1 rīst; 2 rēst, *vt.*  [Scot.]  To dry in the sun or in smoke; cure.  [< Dan. *riste,* broil.]—**reist′ld,** *a.*  1. Smoke-dried.  2. Somewhat tainted.

**reit′bok′,** 1 rīt′bok′; 2 rēt′bŏk′, *n.*  A South-African antelope (*Cervicapra arundineum*), 3 feet high, grizzly ocher above, whitish on the belly; the male has horns a foot long, but the female is hornless.  [< D. *rietbok,* < *riet,* reed, + *bok,* buck.]  **reit′— buck″[,** *n.*

**re-it′er-ate,** 1 rī-it′er-ēt; 2 rē-it′er-āt, *vt.*  [-AT″ED*; -AT″ING.]  To say or do again and again; repeat.  —**re-it′er-a′tion,** *n.*  Repetition.—**re-it′er-a″tiv(e¹.** I.*a.*  Characterized by reiteration.  II. *n.*  1. A word or syllable repeated usually with some slight change, so as to make a reduplicated word, as, for instance, "tittle-tattle."  2. *Gram.*  A word expressing reiterated action.—**re-it′er-a″tiv(e-ly¹, adv.**

**reive,** *vt.*  See under REAVE.  [Scot.]—**reiv′er,** *n.*

**Re″jäne′,** 1 rē″ᶎhn′; 2 rē′ᶎhn′, *n.*  See RÉJU.

**re-ject′¹,** 1 rī-jekt′; 2 rē-jĕct′, *vt.*  1. To cast away or refuse to accept or receive; repel; decline; expel, as from the mouth; also, to refuse (a person) a favorable reception; as, to *reject* a present; to *reject* a suitor.  2. To refuse to grant; deny; as, to *reject* a petition.  3. To cast away as worthless; discard.  4; To cast off.  [< L. re-, back, + *jacio,* throw.]  SYN: see SANCTION.—**re-ject′er,** *n.*   **re-jec′tion[,** *n.*  1. The act of rejecting.  2. That which is rejected.

**re-jec′ta-men′ta,** 1 rī-jek″ta-men′ta; 2 rē-jĕe″ta-mĕn′ta, *n. pl.*  Things thrown away; especially, things rejected from a living organism excrement.  [L.; see REJECT.]

**re-joice′,** 1 rī-jois′; 2 rē-jóis′, *v.*  [RE-JOICED′¹; RE-JOIC′ING.]  I. *t.*  To fill with joy; gladden.  II. *i.*  To feel joyful; be glad.  [< F. *réjouir, réjoice,* < L. ex-, out, + JOY.]
SYN: cheer, delight, enjoy, enrapture, exhilarate, exult, gladden, gratify, joy, please, ravish, triumph.  Compare HAPPINESS, HAPPY.—ANT: afflict, agonize, bewail, grieve, lament, mourn, pain, regret, sadden, sorrow.—**re-joic′er,** *n.*—**re-joic′ing,** II. *a.*  Pertaining to or characterized by joyfulness.  SYN: see HAPPY.  II. *n.*  The feeling or expression of joy.  SYN: see RAPFINESS; LAUGHTER; RAPTURE.

**re-join′,** 1 rī-join′; 2 rē-jóin′, *v.*  I. *t.*  1. To come again into company with; return to; reunite.  2. To say in reply or rejoinder.  II. *i.*  1. To answer to a reply.  2. *Law.*  To make answer to the plaintiff's replication.  [< F. *rejoindre,* to join, < L. re-, again, + JOIN.]—**re-join′der,** *n.*  1. An answer to a reply; also, any reply or retort.  2. *Law.*  The answer filed by a defendant to a plaintiff's replication.  SYN: see ANSWER.

**re-journ′,** *vt.*  1. To adjourn.  2. To refer for information.

**Ré″ju′,** 1 rē″ᶎ⟨ü′; 2 rē″ᶎhū′, Gabrielle Charlotte (1857–1920).  A French actress; stage name, "Réjane"; in private life, Madame Porel.

**re-ju′ve-nate,** 1 rī-jū′vi-nāt; 2 rē-jü′ve-nāt, *vt.*  [-NAT″ED*; -NAT″ING.]  1. To make young or as if young again.  2. *Phys. Geog.*  To restore (a mature or old river) to its youthful condition by the development of lakes, as by obstruction through mountain growth or elevation.  [< RE- + L. *juvenis,* young.]—**re-ju″ve-na′tion,** *n.*—**re-ju″ve-nes′cence,** 1.  A renewal of youth; the state of being or growing young again.  2. *Bot.*  The transformation of the entire protoplasm of a vegetative cell into a primordial cell, which subsequently invests itself with a new cell-wall, and forms the starting-point of the life of a new individual.—**re-ju″ve-nes′cent,** *a.*  Becoming or causing to become young.

**reket,** *v.*  Same as RECK.  [L., relics, remains].

**rel.,** *abbr.*  Relating, relative, relatively, religion, religious, *religus*

**re-laps′¹,** 1 rī-laps′; 2 rē-lāps′.  IV. *vt.*  1. To lapse back as  **re-laps′e¹,** } into disease after partial recovery.  2. To decline; backslide.  II. *n.*  A relapsing; lapse into a former evil state.  [< L. re-, back, + *labor,* slide.]—**re-laps′er,** *n.*

**re-late′,** 1 rī-lāt′; 2 rē-lāt′, *v.*  [RE-LAT′ED*; RE-LAT′ING.]  I. *t.*  1. To recount the particulars of; narrate; tell.  2. To connect, as by blood or marriage; establish some connection, as of thought, nature, character, etc., between.  II. *i.*  To be in connection or association; have reference or regard; refer; with *to.*  [< L.ᴸᵃᵗᵉˢ *relatus,* related, < re-, back, + *latus,* borne.]
SYN: describe, detail, narrate, recite, recount, rehearse, report, state, tell.  See PERTAIN.—ANT: deny, hide, hush up, suppress, withhold.—**re-lat′ed,** *pa.*  1. Standing in relation; connected; especially, of common ancestry; connected by blood or marriage; akin.  2. Narrated.  3. *Mus.*  Belonging to the same harmonic or melodic series.  -ness, *n.*—**re-lat′er,** *n.*  One who relates.

**re-la′tion,** 1 rī-lā′ᶊhun; 2 rē-lā′ᶊhŏn, *n.*  1. The fact or condition of being related or connected, or that by which things are connected, either objectively or in the mind; inter-

dependence; connection; as, family *relations.*  2. The act of relating or narrating; also, that which is related or told.  3. Connection by blood or marriage; kinship.  4. A person connected by blood or marriage; a kinsman: now mostly supplanted in unidiomatic, non-literary usage by *relative.*  5. *Law.*  (1) The statement of the grounds of a complaint or grievance by a relator.   (2) The reaching back and taking effect of an act or judicial decree at a date anterior to its actual occurrence; as, assignment in bankruptcy operates by *relation* back to the date of filing the petition.  6. Reference; regard; allusion: chiefly, in *relation to.*  7. The position of one person with respect to another; as, the *relation* of ruler to subject.  8. *pl.* (1) Conditions in general which bring an individual in touch with his fellows.  (2) The various ways in which one country may come into contact with another politically and commercially.  [V. < L. *relatio*(n-, < *relatus;* see RELATE.]  SYN: see ANALOGY; KINDRED; KINSMAN; REPORT; STORY.—**re-la′tion-al,** *a.*  1. Pertaining to or expressing relation: said especially of certain parts of speech.  2. Having relation or kinship.—**re-la′tion-ship,** *n.*  The state of being related: connection by blood or otherwise.  SYN: see AFFINITY; KIN.—**spiritual relationship,** a relationship arising from sponsorship in baptism.

**rel′a-tiv(e¹,** 1 rel′a-tiv; 2 rĕl′a-tĭv, *n.*  I. *a.*  1. Having connection; pertinent; as, an enquiry *relative* to one's health.  2. Resulting from or depending upon relation; as, a *relative* truth.  3. Intelligible only in relation to each other; as, the *relative* terms 'father' and 'son.'  4. *Gram.*  Referring or relating to an antecedent term; as, a *relative* pronoun.  5. *Mus.*  Having so many tones in common that passage from one to the other is natural and easy; as, *relative* chords or keys.  II. *n.*  1. One who is related; a kinsman.  2. *Gram.*  A relative word or term; especially, a relative pronoun.  [< F., *relatif,* < LL. *relativus,* < L. *relatus;* see RELATE.]  SYN: see KINDRED; KINSMAN.  -ly, *adv.*  -ness, *n.*

**rel″a-tiv′i-ty,** 1 rel″a-tiv′i-ti; 2 rĕl″a-tĭv′ĭ-ty, *n.*  1. The quality or condition of being relative; relativeness.  2. *Philos.*  Existence only as an object of, or in relation to a thinking mind; phenomenality: sometimes called the doctrine of the relativity of existence.  3. A condition of dependence or close relation, as of the solar system on the sun.  4. *Physics.*  A theory that all knowledge of velocity is relative.  As developed by Einstein it assumes that: (1) The velocity of light is a constant independent (a) of its source, (b) of the system with respect to which it is measured, and (c) of the observer save for its motion in relation to other systems.  (2) The velocity of light is a maximum unattainable by the velocity of any material body.  In the mechanics of relativity, the mass of a particle is determined by assuming that the actions of a system of particles do not change the total momentum with respect to a given system.  The mass is not constant but dependent on its velocity—relativity of knowledge, the doctrine that all knowledge is of and through relations, or by relating activity.  (3) The skeptical theory that knowledge of what things really are is impossible, since knowledge itself is dependent upon the mind's purely subjective forms of relating its objects.  (2) The doctrine that all knowledge of particular things is dependent upon the relations in which they or their elements and attributes stand to other things, or to one another.  (3) *Psychol.* The doctrine that, in sense-perception, our apprehension of particular sensible qualities and intensities is always relative to other sensible qualities and intensities present in consciousness just preceding or at the same time.

**re-la′tor,** 1 rī-lē′tor or -tor; 2 rē-lā′tor, *n.*  [L.]  1. One who relates; a relater.  2. *Law.*  One who institutes a special proceeding by relation or by information; as, the *relator* in the writ of quo warranto.—**re-la′trix,** *n. fem.*

**re-lax′¹,** 1 rī-laks′; 2 rē-lăks′, *v.*  I. *t.*  1. To make more lax or loose; slacken; loosen.  2. To make less rigorous, or stringent; mitigate; as, to *relax* a rule.  3. To abate in attention or assiduity; remit.  4. To relieve from strain or effort; ease.  5. To relieve from constipation.  6. To make languid; as, a *relaxing* climate.  7. To deliver over; release.  8. To diminish.  II. *i.*  1. To become lax or loose.  2. To abate in severity; become less rigorous.  3. To remit close attention or application; unbend.  [< F. *relaxer,* < L. re-, again, + *laxus,* loose.]
SYN: abate, divert, ease, loose, loosen, mitigate, recreate, reduce, relieve, remit, slacken, unbend.  Compare WEAKEN.—ANT: bind, confine, contract, strain, stretch, tighten.—**re-lax′a-tiv(e¹,** *a.*—**re-lax′a-tion,** *n.*  1. The act of relaxing, or the state of being relaxed.  2. Indulgence in diversion, as the diversion indulged in.—**re-lax′a-tiv(e-ly¹, a.** & *n.*—**re-lax′er¹, n.**

**re-lay′¹,** 1 rī-lē′; 2 rē-lā′, *vt.*  To lay again.

**re-lay′²,** *n.* & *vi.*  To forward by relay; provide with relays; obtain a relay.

**re-lay′,** 1 rī-lē′ or rī′lā; 2 rē-lā′ or rē′lā, *n.*  1. A fresh set, as of men, horses, or dogs to replace or relieve a tired set.  2. In general, a supply of anything kept in store for anticipated use or need.  3. *Mach.* Same as SERVO-MOTOR.  4. *Teleg.* & *Teleph.*  An electro-mechanical device by means of which a current (usually weak) flowing in one circuit makes or breaks a current (usually stronger) in another circuit.  [< F. *relais,* < *relaisser,* release; see RELEASE.]—relay back, a race between teams composed of runners placed at intervals along the course, who relieve each other in turn.—telephone r., a device which receives currents, corresponding to a message, from one circuit and produces similar ones in another circuit.

**re-lease′¹,** 1 rī-lēs′; 2 rē-lēs′, *vt.*  [RE-LEASED′¹; RE-LEAS′ING.]  1. To free from restraint; liberate; as, to *release* a captive,

**For words in re- not given above see RE-,** *prefix,* pages 946, 947.

A.025